**STATE of Minnesota, Appellant,**

v.

**Brandt Edward STORVICK,
Respondent.**

No. CX–87–2281.

Court of Appeals of Minnesota.

May 3, 1988.

Review Granted June 23, 1988.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Paul G. Morreim, Freeborn County Atty., Albert Lea, for appellant.

Fred W. Wellman, Gerald S. Weinrich, Austin, for respondent.

## OPINION

CRIPPEN, Judge.

The state appeals a pre-trial ruling suppressing evidence seized and statements made as a result of the warrantless search of defendant's home. Because the police lacked exigent circumstances to enter the home, we affirm the suppression order and the dismissal of those charges which were founded on the illegally obtained evidence.

## FACTS

Shortly after 9:00 p.m. on May 27, 1987, Carol Marie Jensen was struck by a hit-and-run driver on a county road, and she died of her injuries soon thereafter. A witness who was walking with her at the time stated that the car that struck Ms. Jensen was traveling at a high rate of speed and continued down the road without slowing or stopping after the impact. The witness made an approximate identification of the car by size, color and year.

Police arrived at the scene shortly afterwards. They retrieved pieces of glass and bits of plastic broken from the vehicle. They observed no braking marks at the scene. At the hospital where Ms. Jensen was taken, one officer obtained her right tennis shoe. Police determined from the debris found that the vehicle was a Ford manufactured after March 1985.

At about 11:15 p.m., an officer driving near the accident scene encountered a newer model Ford that fit the description of the hit-and-run vehicle. The right front of the car was damaged and what appeared to be human hair was found on the broken part. Another officer compared the pieces found at the scene with the car and determined that they matched.

The driver of the Ford was Larry Brandt, respondent Brandt Storvick's brother-in-law. He told police that he had just picked up the car at Storvick's house, which was nearby. Brandt said he took the keys from Storvick's bedroom where Storvick was sleeping. The police proceeded to Storvick's house. Meanwhile, they learned from Brandt that Storvick might have firearms at his house.

When the police officers arrived at Storvick's house, they saw a shoe in the driveway which was later determined to be the mate to Ms. Jensen's.

The officers knocked on the door and rang the doorbell; but got no answer. The house was dark but one of the officers said he heard a noise coming from upstairs. Two officers then entered the garage, and repeatedly called for Storvick. The officers then entered the lower level of the house through the door in the garage. They identified themselves and eventually Storvick responded. The sheriff asked him if they should go upstairs or if Storvick would come down; Storvick said he would come down.

Storvick came downstairs to the lower level. He was upset and asked if it was proper for the officers to be in the house.

The sheriff commented that they had been invited in by him. The officers asked Storvick about the accident several times. He was not responsive, and said the whole thing was too scary and he had nothing to say. The officers noted a strong odor of liquor about Storvick.

The officers arrested Storvick for leaving the scene of a personal injury accident. They read him the Miranda warning, and Storvick did not acknowledge whether he understood. When the officers mentioned the odor of alcohol, Storvick said "I had something to drink after I got home." One officer accompanied Storvick while he got dressed upstairs, and looked around in the upstairs bedrooms for evidence of alcohol consumption. Meanwhile the other officer looked into some kitchen cupboards, in the kitchen garbage bag, and in a garbage can in the garage. Neither found any empty bottles or other evidence of drinking.

The officers took respondent to a nearby hospital where they took a blood sample from him, over Storvick's objection, at 12:03 a.m. His blood alcohol content was .19.

In the next few days, the police interviewed a number of people who saw Storvick that evening before 9:00. All of them stated that he showed no signs of intoxication and that they did not see him drinking, with the exception of one beer while he and his family were boating between 7:45 and 8:30. Several of the witnesses saw Storvick between 8:30 and 9:00. One woman saw Storvick drive by and waved to him shortly after 9:00, about 1500 feet from the scene of the accident. She also stated he was not driving erratically.

Storvick's wife told the police she searched their house the day after the accident for evidence of his drinking. In a locked cupboard in the basement, she found two empty flasks, which she said had contained some whiskey and vodka four days before the accident.

Storvick was originally charged as follows: Count I, criminal vehicular operation resulting in death (gross negligence), Minn. Stat. § 609.21, subd. 1(1) (1986); Count II, criminal operation resulting in death (while

under the influence of alcohol), section 609.21, subd. 1(2) (1986); Count III, gross misdemeanor DWI, section 169.121, subds. 1(a), 3(a) (Supp.1987); Count IV, leaving the scene of a crash resulting in a fatality, section 169.09, subds. 1, 14(a)(1) (1986); and Count V, failure to notify law enforcement agency of a crash resulting in a fatality, section 169.09, subds. 6, 14(a)(1) (1986). At the omnibus hearing, the prosecutor was permitted to amend the complaint to include Counts VI and VII: criminal vehicle operation resulting in death (with a blood alcohol concentration of .10 or more), Minn. Stat. § 609.21, subd. 1(3) (1986); and driving a motor vehicle while having an alcohol concentration of .10 or more, section 169.-121, subds. 1(d), 3(a) (Supp.1987).

After the omnibus hearing the trial court suppressed "all evidence obtained by the police as a result of their illegal warrantless entry into Defendant's home;" including Storvick's statements to the police, the police officers' observations that he smelled of alcohol, and the results of the blood test. The court dismissed the consumption-related charges, Counts II, III, VI, and VII of the amended complaint, for lack of probable cause.

The trial court stated that the warrantless search violated the fourth amendment because it was neither consensual nor justified by exigent circumstances. Suppression of the evidence left the state inadequate evidence to establish probable cause that respondent was intoxicated at the time of the accident, so the trial court dismissed counts relating to his intoxication. The state appeals.

## ISSUE

Did the trial court err in suppressing the evidence and dismissing the charges related to intoxication?

## ANALYSIS

When the state appeals from a pretrial suppression order, on appeal we are to reverse the determination of the trial court only if the state demonstrates clearly and unequivocally that the trial court has erred

in its judgment and that, unless reversed, the error will have a critical impact on the outcome of the trial. *State v. Webber*, 262 N.W.2d 157, 159 (Minn.1977).

The paramount interest protected by the fourth amendment to the U.S. Constitution is the sanctity of the home. The fourth amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." *Payton v. New York*, 445 U.S. 573, 576, 100 S.Ct. 1371, 1375, 63 L.Ed.2d 639 (1980).

 Lacking consent, the police entry into respondent's home can be justified only if exigent circumstances existed at the time. The officers have a heavy burden to sustain a warrantless search or arrest in the home because these acts are per se unreasonable absent exigent circumstances. *State v. Lohnes*, 344 N.W.2d 605, 610 (Minn.1984).

The United States Supreme Court has not specifically defined "exigent circumstances." *Id.* However, the widely followed case of *Dorman v. United States* enumerates six factors which must be met to justify a warrantless entry. *Dorman*, 435 F.2d 385, 392–94 (D.C.Cir.1970). The Minnesota Supreme Court expressed its agreement with the factors:

> First, that a grave offense is involved, such as a crime of violence; second, that the suspect is believed to be armed; third, that there be a clear showing of probable cause to believe the suspect committed the crime; fourth, strong reason to believe the suspect is on the premises; fifth, a likelihood the suspect will escape if not swiftly apprehended; sixth, that although the entry may not be with consent it must be peaceable.

*State v. Lasley*, 306 Minn. 224, 232, 236 N.W.2d 604, 609 (1975). More recently, the supreme court stated that rather than adopting an inflexible list of six possible factors, Minnesota courts should "consider the totality of the circumstances surrounding the entry and the seizure." *Lohnes*, 344 N.W.2d at 611.

The six factors are useful as guidelines in deciding whether exigent circumstances existed. The strongest reason justifying the entry was the seriousness of the offense. The police knew a victim had been severely and probably fatally injured. In addition, it is evident police had probable cause to conclude respondent was asleep at home.

The police officers' entry into the house appeared to be peaceful, although they were not let in the door and they were armed when they entered Storvick's house. The fact that Storvick was asleep in bed and it was nighttime made the officers' entrance somewhat more threatening.

The case presents more difficult questions as to fear appellant was armed, knowledge that he was the driver of the car involved in the incident, and anticipation that he might escape. As for dangerous weapons, the instrument that caused the death, Storvick's car, was in the custody of the police. The police knew Storvick was home and not out driving while possibly intoxicated. As the trial court stated, "[w]hile the charges are of a serious nature, there was no gun, knife or weapon used in the commission of the crime." The police were informed that Storvick might have guns in his house, but they had no reason to believe the guns presented a danger to them. Appellant was not known to have a criminal reputation, there was no evidence an intentional homicide had occurred, and there was no other evidence appellant was apt to be violent. On the other hand, it was Storvick's brother-in-law who mentioned the guns, and his closer knowledge of Storvick adds credibility to any warning he might have given the police.

The police had some cause to believe that Storvick had driven the hit-and-run vehicle. First, the police had found the likely hit-and-run vehicle. Witnesses had identified the crash car as similar in model, year and color; the vehicle had damage consistent with the impact, and what looked like human hair had been found on it. Storvick's brother-in-law told the police that the car was one Storvick borrowed from a dealership and that Storvick had been driving the car earlier that evening. He also told po-

lice that he had found the car at Storvick's house and the keys in Storvick's clothing in his bedroom, where Storvick was asleep. When they arrived at Storvick's house, the police found a tennis shoe in the driveway that could have been the victim's. A witness saw Storvick shortly before the accident, driving about 1500 feet from the scene of the impact, but the police did not interview her until the next morning.

On the other hand, the police talked to the brother-in-law, Larry Brandt, more than two hours after the accident, so his statement as to when Storvick was driving was not necessarily accurate. Further, it would have been reasonable for the police to suspect Brandt was the hit-and-run driver because he was driving the suspected car. It is not clear whether Brandt voluntarily encountered the police. The officer testified that when he approached the Ford with his lights flashing, the car stopped. When the officer got out of his squad car, Brandt then got out of his car. The officer did not indicate that Brandt showed any signs of intoxication, but it would have been logical to check. Brandt insisted to the officer that he had not been driving the car earlier, and that Storvick had.

The police were clearly not in hot pursuit of Storvick; they had not been following or chasing him and he had not just left the scene of the accident. There was no imminent danger to human life, because Storvick was not driving and the police had the car. Furthermore, before they entered his house, the police had no evidence that Storvick was intoxicated. There was no indication that Storvick might flee the area; he was asleep in bed in his home and making no effort to hide. Because Storvick was known to live nearby, the police knew he was not a stranger in town who would likely run from the area.

A related concern is the possibility of imminent destruction of the evidence. The state argued that a large percentage of serious highway accidents are caused by drivers influenced by chemicals and therefore it was imperative for the police to determine whether Storvick was intoxicated. The trial court rejected this argument

for two reasons: the police did not have sufficient evidence Storvick was driving the vehicle at the time of the accident, and during the lapse of time between the accident (just after 9:00 p.m.) and the police arriving at Storvick's house (between 11:15 and midnight) the evidence of alcohol would have dissipated to some extent.

The state must meet a heavy burden to sustain a warrantless search, and we must affirm trial court judgment on the question which is not clearly wrong. Without more likely use by Storvick of a dangerous weapon, and where the police were not in hot pursuit of someone likely to escape, there were not sufficient exigent circumstances to compel reversing the trial court decision. The totality of the circumstances do not require a different result. *See Lohnes,* 344 N.W.2d at 611.

## DECISION

We conclude the state did not meet its burden of showing exigent circumstances that would justify intrusion into appellant's home. The trial court correctly excluded evidence seized and statements respondent made as a result of the warrantless entry. Without this evidence there was insufficient evidence of respondent's intoxication, and the trial court correctly dismissed the charges relating to intoxication.