STATE of Minnesota,
Petitioner, Appellant,

v.

Brandt Edward STORVICK,
Respondent.

No. CX–87–2281.

Supreme Court of Minnesota.

Aug. 5, 1988.

Rehearing Denied Sept. 12, 1988.

Paul G. Morreim, Freeborn Co. Atty., Albert Lea, for appellant.

Fred W. Wellmann, Gerald S. Weinrich, Austin, for respondent.

AMDAHL, Chief Justice.

We granted the state's petition for review of a decision of the court of appeals affirming a pretrial order of the district court suppressing evidence on Fourth Amendment grounds and dismissing certain criminal charges. The court of appeals held that the police violated *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), in entering defendant's home without a warrant in order to investigate and, ultimately, arresting defendant for the felony offense of criminal vehicular operation, Minn.Stat. § 609.21 (1986). *State v. Storvick*, 423 N.W.2d 398 (Minn.1988). It based this on its belief that there were no "exigent circumstances" justifying the warrantless entry. 423 N.W.2d at 402. We disagree and conclude that, given the facts of the case, the warrantless entry was justified. Accordingly, we reverse the decision of the court of appeals and remand for trial on all the original charges.

Around 9:00 p.m. on May 27, 1987, 17-year-old Carol Marie Jensen and a friend, Michelle Evenson, were walking north bound on the east side of the north bound lane of County Road 101, ½ mile north of Old Highway 13 in Freeborn County. The speed limit for cars was 55 miles per hour. It was dusk, but one could still see well without artificial illumination. The weather was fine. The asphalt pavement was dry. Jensen was on the white fog line; Evenson was to her right on the shoulder. Evenson heard a car, also going north bound, traveling at what she thought was a high rate of speed. She turned, saw the car head directly at Jensen and saw it hit Jensen, sending her flying through the air over 100 feet. The car did not brake or skid before the accident, and it continued driving after the accident without stopping or slowing.

An ambulance was called immediately. Police were dispatched to the scene moments later, at 9:07 p.m. Evenson told the officers what had happened and said that she believed the car had swerved at them intentionally and tried to hit them. She described the car as a brand new car, either 1986 or 1987 model, white in color.

The investigation by state troopers and the sheriff's office began immediately. Officers processing the scene found no skid, brake or other tire marks. Another officer went to the hospital in Albert Lea at

around 9:25 p.m. to learn that the victim had a severe head injury and was unconscious and in grave condition. She was about to be flown to Rochester in the hope that something could be done for her there. This officer took a number of items of clothing worn by the victim, including her right tennis shoe, the left not having been found. Meanwhile, the sheriff obtained some crash debris from deputies at the scene and proceeded to the local Chevrolet dealership. After looking at the debris, an employee of the parts department said that the pieces were from the right front signal and clearance lights and probably came from a Ford car manufactured after March 1985. Officers canvassed the area for witnesses and for a white newer model Ford with right front end damage.

At 11:15 p.m. Trooper Brad Smith spotted a white 1986 Ford Tempo with damage to its right front end. The car was at the intersection of Old Highway 13 with County Road 101 approximately ½ mile from the scene of the accident. When Smith approached the vehicle, the driver, Larry Arthur Brandt, who is married to defendant's sister, got out, saying, "Are you looking for this?" The trooper said yes and asked Mr. Brandt what he was doing. Mr. Brandt explained that he had gotten off work a short time earlier, that defendant's wife was at his mother's place, that they had been looking for defendant, that he found defendant home asleep in bed at defendant's place, and that he had just gotten the keys for the car from the bedroom and left there. The sheriff's department checked and verified that Mr. Brandt had left his place of employment at 9:44 p.m., after the accident. Michelle Evenson, who was with the victim at the time of the accident, was brought to the scene, and she positively identified the car as the car that hit the victim. Another trooper, the accident reconstructionist, came and determined that pieces of debris he had in his possession fit perfectly on the car. Police checked and learned that the car belonged to the local Ford dealership, where defendant was an employee.

Sheriff Donald Nolander made the decision to go immediately to defendant's house, which was just a few hundred yards away from where Mr. Brandt, defendant's brother-in-law, was stopped. The sheriff (who was still wearing a softball uniform), two deputies, and a trooper arrived at defendant's house at 11:28 p.m., 2½ hours after the accident. When they got there, one of them found the victim's missing tennis shoe on the driveway. Simultaneously, they received a radio message telling them to use caution because Mr. Brandt had told one of the officers that defendant had weapons. The residence, a split level, was dark. The sheriff and one of the deputies rang the doorbell and pounded on the door. They got no response, but one of them heard a "thump." They then entered the attached garage through the open garage door and pounded on the door leading from the garage into the "mud room" or "family room" of the residence. They still got no response. At that point the sheriff opened the unlocked door into the family room and stepped inside, announcing that it was the sheriff's department, asking if anybody was home, and yelling, "Brandt [which is the defendant's first name], can you hear me? Anybody home? Hello, Brandt." Finally defendant said something from upstairs, and the sheriff replied, "This is Don Nolander from the Sheriff's Department. Brandt, we need to talk to you. Do you want to come downstairs or do you want us to come upstairs and talk to you?" Defendant said he would be down in a minute.

One of the officers went into the living room so that he could see and make sure defendant did not have a gun when he came down the stairs. Once defendant came down, the sheriff, who had learned that the victim was "brain dead," said, "Brandt, we are investigating a serious accident that is probably going to end up being a fatality, and we need to talk to you about that." Defendant was in a stupor and, in response to questions such as this, simply said, "I am too scared, I can't talk about anything" and "What are you doing in my house?" Unable to get defendant to answer any questions, the officers finally placed defendant under arrest for the felo-

ny offense of leaving the scene of a personal injury accident, Minn.Stat. § 169.09, subds. 1 and 14(a) (1986), and gave him a *Miranda* warning. Defendant invoked his right to silence. When defendant was getting dressed, one of the officers told defendant that they had noted the odor of liquor on him and that they would be taking him to the hospital for a blood test whether or not he consented. Defendant responded to this information by saying, "I drank after I got home." A decision was then made to check the house to see if there was any evidence that defendant had drunk liquor after he got home. The officers checked and found no such evidence.

Defendant was taken to the hospital and a blood sample was taken from him at 12:03 a.m., 3 hours after the accident. His blood alcohol concentration at that time was .19.

Defendant was charged as follows:

I. Felony Criminal Vehicular Operation Resulting in Death (grossly negligent driving), Minn.Stat. § 609.21, subd. 1(1);

II. Felony Criminal Vehicular Operation Resulting in Death (negligent driving while under the influence of alcohol), Minn.Stat. § 609.21, subd. 1(2);

III. Gross Misdemeanor DWI (DWI within 5 years of prior DWI conviction), Minn.Stat. § 169.121, subds. 1(a) and 3(a);

IV. Felony Leaving the Scene of an Accident Resulting in a Fatality, Minn.Stat. § 169.09, subd. 1 and 14(a)(1);

V. Felony Failure to Notify Law Enforcement Agency of Crash Resulting in Fatality, Minn.Stat. § 169.09, subds. 6 and 14(a)(1);

VI. Felony Criminal Vehicular Operation Resulting in Death (negligent driving by one with blood alcohol concentration of .10 or more), Minn.Stat. § 609.21, subd. 1(3); and

VII. Gross Misdemeanor DWI With Alcohol Concentration of .10 or More (within 5 years of similar offense), Minn.Stat. § 169.121, subd. 1(a) and 3(a).

The trial court held that the police violated defendant's Fourth Amendment rights in entering the house without a warrant and suppressed the blood test results and other evidence that was the fruit of the entry. Having done this, it dismissed, for lack of probable cause to proceed to trial, counts II, III, VI and VII. This means that the only criminal vehicular operation charge remaining is the one requiring the state to prove that defendant was operating his car in a grossly negligent manner at the time of the accident, a charge that is more difficult to prove than the criminal vehicular operation charges that were dismissed.

The court of appeals affirmed, holding that there were no "exigent circumstances" justifying the warrantless entry. *State v. Storvick*, 423 N.W.2d 398, 402 (Minn.1988). In so holding, it relied on the 6–factor *Dorman* analysis, named after *Dorman v. United States*, 435 F.2d 385, 392–94 (D.C. Cir.1970), relied on in our opinion in *State v. Lasley*, 306 Minn. 224, 232, 236 N.W.2d 604, 609 (1975). The court of appeals said, in part, "Without more likely use by Storvick of a dangerous weapon, and where the police were not in hot pursuit of someone likely to escape, there was not sufficient exigent circumstances to compel reversing the trial court decision." 423 N.W.2d at 402.[1]

The leading Minnesota case dealing with "exigent circumstances" justifying a warrantless entry to arrest is *State v. Lohnes*, 344 N.W.2d 605, 611 (Minn.1984), where we made it clear that we will not rigidly follow the *Dorman* analysis but will flexibly consider all the circumstances, including those mentioned in *Dorman* and others not men-

---

1. Although not a factor in our decision to reverse the court of appeals, we note that the court of appeals said at one point in its opinion that it must affirm the trial court in a case such as this if the trial court's decision is "not clearly wrong." 423 N.W.2d at 402. The "clearly erroneous" test referred to by the court of appeals is the test that would be properly used in the first instance if the trial court had rejected some of the officers' testimony. The correct approach in a case where the facts are not significantly in dispute is to simply analyze the testimony of the officers and determine if, as a matter of law, the officers were justified under the cases in doing what they did. *Berge v. Commissioner of Public Safety*, 374 N.W.2d 730, 732 (Minn.1985).

tioned, to determine if "exigent circumstances" existed to justify the warrantless entry.

Subsequent to *Lohnes*, the United States Supreme Court in *Welsh v. Wisconsin*, 466 U.S. 740, 753, 104 S.Ct. 2091, 2099, 80 L.Ed. 2d 732 (1984), dealt with the question of whether the need to ascertain the blood-alcohol level of a driver who had fled the scene of an accident would constitute an "exigent circumstance." In *Welsh* the driver lost control of the car and came to a stop in a field without causing any injury to any person or damage to any property. A witness who saw the driver walk away told the police that the driver was either inebriated or sick. The police went to the driver's house, which was nearby, and entered after the driver's stepdaughter answered the door. They found the driver lying in bed, arresting him and tried to get him to take an implied consent test. He refused. The United States Supreme Court indicated that it did not necessarily approve of the entire *Dorman* analysis, but said that it did agree with the *Dorman* court that the gravity of the offense was an important factor. 466 U.S. at 572, 104 S.Ct. at 2104. The Court referred to the need to ascertain the driver's blood alcohol level as an "exigent circumstance." [2] 466 U.S. at 753–54, 104 S.Ct. at 2099–2100. However, the Court said that assuming the facts would support a determination that the police needed to ascertain the driver's blood alcohol level, the police there could not rely on that as a factor justifying the entry because "The State of Wisconsin has chosen to classify the first offense for driving while intoxicated as a noncriminal, civil forfeiture offense for which no imprisonment is possible" and "This is the best indication of the State's interest in precipitating an arrest, and is one that can be easily identified both by the courts and by officers faced with a decision to arrest." 466 U.S. at 754, 104 S.Ct. at 2100. Concurring, Justice Blackmun made it clear he would have voted differently if the State of

Wisconsin had made DWI a criminal offense, not a civil violation. 466 U.S. at 755, 104 S.Ct. at 2100. Chief Justice Burger said that he would have dismissed the writ as improvidently granted. 466 U.S. at 755, 104 S.Ct. at 2100. Justices White and Rehnquist dissented. 466 U.S. at 756, 104 S.Ct. at 2101.

We believe that the result would have been different in *Welsh* if the Court had been faced with the facts in our case rather than those in *Welsh*. Relying on *Welsh*, *Lohnes* and on Professor LaFave's discussion in 2 W. LaFave, Search and Seizure § 6.1(f) (1987), we analyze the case as follows:

(1) The officers had strong probable cause to believe that the very serious felony offense of either criminal vehicular operation or criminal vehicular operation resulting in death had been committed. In order to obtain a conviction of either offense, the state had to show grossly negligent driving, not necessarily an easy thing to show, or negligent driving by one who either was under the influence of alcohol or had a blood alcohol concentration of .10 or more.

(2) The field investigation began at 9:07 p.m., immediately after the accident, and was an ongoing and continuing field investigation up to the point of arrest. Professor LaFave argues that when the occasion for arrest arises in the field during a continuous field investigation of this sort, "The presumption should be in favor of a warrantless arrest rather than against it." 2 W. LaFave, Search and Seizure § 6.1(f) at 601–02 (1987).

(3) The investigation was a model investigation, with the officers acting cautiously, prudently and with due regard for the rights and sensibilities of the people involved. The police checked with a car dealer to determine the type of car that they should look for. Once they found the suspect vehicle, they carefully questioned Larry Brandt, defendant's brother-in-law, and

---

**2.** The preservation of evidence, by the way is not one of the factors on the *Dorman* list. That the Court in *Welsh* recognized that the need to preserve evidence is an "exigent circumstance" shows that we were correct in *Lohnes* in saying that there were other factors in addition to those listed in *Dorman* that ought to be considered.

checked out his story. They did not just assume that because the car had front end damage it was the car that they were looking for. Instead, they called the victim's friend, Ms. Evenson, to the scene to identify the car and they had the accident reconstructionist check to make sure that the debris found at the accident scene fit on the car. They also checked and found that the car belonged to defendant's employer. When they went to defendant's house at 11:28 p.m., 2½ hours after the accident, they had not wasted a minute's time and yet they were satisfied that defendant's car was the car that had struck the victim and that defendant, not his brother-in-law, had been driving the car. Once they got to the scene, their degree of certainty only increased because they found the victim's missing shoe in defendant's driveway.

(4) Defendant did not respond to the officers' repeated knocking and doorbell ringing, but the officers heard a "thump." They then entered the attached garage through the open garage door and pounded on the door from the garage into the residence. Defendant still did not respond. At that point the sheriff had a decision to make: attempt to obtain a warrant or proceed to enter the house without a warrant. We believe that the sheriff and the other officers acted properly in entering the house without a warrant because they had every reason to believe that defendant had been drinking and they needed to act as quickly as possible to precisely ascertain defendant's blood alcohol level before the evidence dissipated.

In *State v. Speak,* 339 N.W.2d 741, 745 (Minn.1983), we said that the probable cause needed for police to conduct a warrantless nonconsensual blood test in an investigation of a person for criminal vehicular operation resulting in death ("assuming that probable cause is needed") is "probable cause to believe that the crime of criminal negligence has been committed and probable cause to believe not that the defendant is intoxicated but that adminis-

tration of the [blood] test will result in the discovery of evidence that will aid in the prosecution of that crime." Evidence short of evidence that the defendant was intoxicated or had a blood alcohol concentration of .10 or more could aid in the prosecution of the crime because one can be under the influence of alcohol even if one is not intoxicated or does not have a blood alcohol concentration of .10 or more. *See, e.g., State v. Stark,* 363 N.W.2d 53, 55–56 (Minn.1985) (a driver is under the influence if his capacity to drive is impaired in some way). Here, by fleeing the scene of the accident, defendant prevented the police from observing him and basing a probable cause assessment on their observations. However, there nonetheless was an objective basis for believing that it was necessary to scientifically ascertain defendant's blood alcohol level: (a) at a minimum, the police had strong evidence of negligently inattentive driving on defendant's part, the sort of inattention that often is explained by the defendant's being under the influence of alcohol; (b) it was the time of day that, when an accident such as this occurs, drinking is often found to be involved; (c) the fact that defendant not only did not slow down but fled the scene tended to suggest that he had been drinking, intoxication being a common reason people flee accidents; (d) Larry Brandt's statement to the police that defendant was asleep and that he got the keys from defendant's bedroom certainly fits in with the view that defendant was intoxicated or under the influence and had gone home and passed out; (e) the fact that defendant left the victim's shoe in the driveway perhaps tended to suggest that he was intoxicated or at least under the influence; and (f) the fact that defendant did not respond to the repeated loud knocking and doorbell ringing further suggested that defendant either had passed out or that he heard the police and was not going to answer because he had something to hide, most likely that he had been drinking.[3] Considered together, these facts pro-

3. Relevant cases include: *Eggersgluss v. Commissioner of Public Safety,* 393 N.W.2d 183, 185 (Minn.1986) (circumstances of accident used to establish that police had probable cause that defendant was under influence at time of accident; also, defendant's lack of truthfulness in

vided an objective basis for believing that it was necessary to ascertain defendant's blood alcohol level.

The additional fact that "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system," meant that "[t]here was no time to seek out a magistrate and secure a warrant." *Schmerber v. California,* 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–1836, 16 L.Ed.2d 908 (1966) (upholding warrantless removal of blood from person arrested for DWI). *See also State v. Speak,* 339 N.W.2d 741, 745 (Minn.1983) (exigent circumstances for a warrantless nonconsensual blood test deemed "clearly present" in investigation for criminal vehicular operation resulting in death, the only issue being whether the police had probable cause to administer the test).

In summary, given the extremely serious nature of the offense, given the fact the field investigation began immediately after the accident and continued nonstop to the moment over 2 hours later when the decision to enter without a warrant was made, given the fact that the investigation produced strong probable cause to believe not only that defendant was guilty of the offense but that he was in the residence, given the fact that defendant did not respond to repeated attempts to get him to answer the door, and given the officers' objective basis for believing that defendant had been drinking and that prompt action was necessary in order to obtain and preserve evidence of his drinking before the evidence dissipated, we believe that the requisite "exigent circumstances" were present and that the officers were justified in entering the residence without a warrant and proceeding as they did.

We emphasize that our decision is a limited one based on the facts of this case. We are not asked to decide and do not decide whether the result would have been the same, or different, if the facts had been different, as for example, if the offense

talking with the police showed consciousness of guilt on his part, which in turn bore on probable cause issue); *State v. Speak,* 339 N.W.2d

being investigated had been a less serious offense. Suffice it to say, the expectation of privacy that one has in one's residence is the core expectation or interest protected by the Fourth Amendment and we are and will be hesitant in finding exigent circumstances for warrantless entries of dwellings.

Reversed and remanded for trial.

741, 745 (Minn.1983) (evidence of inattention at time of accident bore on probable cause determination).