STATE OF MINNESOTA

IN SUPREME COURT

A15-1432

Court of Appeals                                        Lillehaug, J.
                                              Concurring, Stras, J.
                                   Took no part, Chutich, McKeig, JJ.

State of Minnesota,

         Respondent,

vs.                                             Filed:  November 30, 2016
                                                Office of Appellate Courts

Jose Martin Lugo, Jr.,

         Appellant.

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

Kathleen A. Kusz, Nobles County Attorney, Travis J. Smith, Special Assistant County Attorney, Slayton, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin J. Butler, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.    *State v. Webber*, 262 N.W.2d 157 (Minn. 1977), did not establish a deferential standard of review of a district court's legal conclusions in pretrial appeals by the State under Minn. R. Crim. P. 28.04.

1

2.    Law enforcement officers' use of a trained drug-detection dog to sniff the exterior of appellant's vehicle was supported by a reasonable, articulable suspicion of drug-related criminal activity.

Affirmed.

O P I N I O N

LILLEHAUG, Justice.

Following a search of his vehicle during a traffic stop, appellant Jose Martin Lugo, Jr., was charged with second-degree controlled substance crime, driving after revocation, and possession of drug paraphernalia. Lugo moved to suppress the evidence obtained during the search, arguing that police illegally expanded the scope and duration of the stop without a reasonable, articulable suspicion. The district court granted Lugo's motion to suppress and dismissed both drug-related charges.

The State appealed to the court of appeals. In an unpublished opinion, the court applied de novo review and held that the expansion of the stop was supported by a reasonable, articulable suspicion. The court of appeals reversed the district court's order suppressing the evidence and dismissing the charges, and remanded the case. Lugo appealed. We granted review to consider two issues.

The first issue is whether our decision in *State v. Webber*, 262 N.W.2d 157 (Minn. 1977), established a special, deferential standard of review for a district court's legal conclusions in pretrial appeals by the State under Minn. R. Crim. P. 28.04, subd. 1. The second issue is whether a dog-sniff of Lugo's vehicle was supported by a reasonable, articulable suspicion.

2

On the first issue, we hold that *Webber* did not establish a deferential standard of review in pretrial criminal appeals by the State, and, to the extent our language in *Webber* suggests otherwise, that portion of the opinion is overruled. On the second issue, we hold that, under the totality of the undisputed facts, the dog-sniff was supported by a reasonable, articulable suspicion. Thus, we affirm the court of appeals.

On the morning of February 23, 2015, Agent Joe Joswiak of the Buffalo Ridge Drug Task Force was conducting surveillance at what he considered to be a "known drug house" in Worthington. Joswiak could see a vehicle parked in the driveway of the home, with a single occupant sitting in the driver's seat. The Nobles County dispatcher advised Joswiak that the vehicle's registered owner was Justin Keodouangdy. A felony warrant had been issued in Anoka County for Keodouangdy's arrest for possession of a firearm by an ineligible person and multiple counts of fifth-degree possession of a controlled substance.

As Joswiak watched, the occupant left the vehicle and walked toward the house. After about 12 minutes, the person who had been in the vehicle returned and drove away. At Joswiak's request, Sgt. Tim Gaul of the Worthington Police Department located the vehicle and initiated a traffic stop by activating the overhead lights on his squad car.

The vehicle did not immediately stop, so Gaul followed it a short distance. The vehicle turned into a parking lot, made a 180-degree turn, drove 30 to 50 yards across the parking lot, and finally came to a stop. After the vehicle stopped, Gaul saw the driver bend over out of sight for a brief moment, before sitting up again. By this time, Joswiak had arrived at the scene, and together he and Gaul approached the vehicle.

3

Joswiak recognized the driver as Lugo. Joswiak knew that Lugo's driving privileges had been revoked and that Lugo had previously been arrested for fifth-degree drug possession.

Gaul confirmed by computer that Lugo's driving privileges were revoked and that he did not own the vehicle. When Gaul asked Lugo who the vehicle's owner was, Lugo initially replied "Jason," but quickly changed his answer to his cousin "A.I." At one point in the brief questioning, Lugo said, "man just take me to jail, please." Gaul asked if there was anything illegal in the vehicle. Lugo replied that as far as he knew there was not.

While Gaul attended to Lugo, Joswiak peered into the vehicle. He observed what he later described as "numerous indicators of illegal drug trafficking": the vehicle's center console molding had been removed, the "plastic pieces . . . had been messed with," and the vehicle had a "lived-in look." Joswiak also considered as indicative of drug trafficking the facts that Lugo took an "unusual[ly] long time to stop" after Gaul activated his overhead lights; Lugo was observed leaving a known drug house; two months earlier Lugo had been arrested for possession of a controlled substance and fleeing a peace officer on foot; and approximately two years earlier, in June or July 2013, the vehicle's owner, Keodouangdy, was arrested in Worthington for fifth-degree drug possession, and a meth pipe was found in his vehicle.

Based on his observations and on his drug-enforcement experience, Joswiak arranged for Worthington police officer Mark Riley to bring a trained drug-detection dog to sniff the vehicle exterior. The dog alerted to the presence of drugs at the driver's door and at the trunk. Joswiak then searched the vehicle and found methamphetamine concealed

4

in a deodorant container in the back seat. Joswiak also found a glass pipe containing burned methamphetamine residue hidden in a sock in the trunk.

The State charged Lugo with second-degree controlled substance possession, Minn. Stat. § 152.022, subds. 2(a)(1), 3(b) (2014) (possession of methamphetamine); driving after revocation, Minn. Stat. § 171.24, subd. 2 (2014); and possession of drug paraphernalia, Minn. Stat. § 152.092 (2014). Lugo moved to suppress the evidence seized during the vehicle search. He conceded that officers had a sufficient factual basis to stop him. But he argued that the officers illegally expanded both the duration and the scope of the stop, by detaining him while they waited for the dog to arrive, and by conducting the dog-sniff, all without a reasonable, articulable suspicion that Lugo was engaged in drug-related criminal activity.

At an evidentiary hearing, the district court received the officers' incident reports in evidence and heard testimony from Officer Joswiak. The court granted Lugo's motion to suppress. The court found Joswiak's testimony to be credible, but it agreed with Lugo that the undisputed facts articulated by Joswiak did not establish a reasonable, articulable suspicion of criminal drug activity. The court cited the absence of any "visible signs" in the "lived-in" vehicle of drug use or drug trafficking; the lack of evidence that Lugo was under the influence of a controlled substance; and the lack of testimony or argument about why a vehicle's messy interior is indicative of drug trafficking. The court declined to rely on Lugo's "nervousness," noting that case law in Minnesota shows great reluctance to rely on this factor to support a reasonable, articulable suspicion. The court conceded that Lugo's driving behavior was "odd." But in the absence of evidence that Lugo was under

5

the influence of drugs, the court stated, odd driving behavior is not indicative of criminal drug activity. Finally, the court determined that Lugo's criminal history did not support a reasonable, articulable suspicion, because Lugo had only been charged, and not convicted; the conduct underlying the charges occurred almost four months before this incident; and Gaul's pat-search of Lugo revealed no drugs or paraphernalia. Looking at all these facts together, the court concluded there was not a reasonable, articulable suspicion of criminal drug activity. Thus, concluded the court, the expansion of the stop was unlawful and all evidence seized as a result must be suppressed. The court ordered that both drug-related charges be dismissed.

The State appealed to the court of appeals, which reversed the district court in an unpublished opinion. *State v. Lugo*, No. A15-1432, 2016 WL 764514 (Minn. App. Feb. 29, 2016). The court noted that when the State appeals from a pretrial suppression order under Minn. R. Crim. P. 28.04, "it 'must clearly and unequivocally show both that the [district] court's order will have a critical impact on the state's ability to prosecute the defendant successfully and that the order constituted error.' " *Id.* at *2 (quoting *State v. Scott*, 584 N.W.2d 412, 416 (Minn. 1998)). Because the district court had dismissed two of the three charges against Lugo, the court had no difficulty finding critical impact. *Id.*

With respect to whether the State had shown clear error, the court stated that it reviewed the district court's factual findings for clear error and its legal determinations de novo. *Id.* at *3 (citing *State v. Gauster*, 752 N.W.2d 496, 502 (Minn. 2008)). In this case, with the relevant facts undisputed, whether the search was justified by reasonable suspicion

6

was "a legal determination . . . review[ed] de novo." *Id.* (citing *State v. Burbach*, 706 N.W.2d 484, 487 (Minn. 2005)).

The court acknowledged that Joswiak did not explain how each of the factors he articulated formed an objective, particularized basis for his suspicion that Lugo was involved in drug trafficking, and that the State's memorandum of law provided some of the missing explanation, but not all. *Id.* at *4. But "[d]espite the [S]tate's failure to precisely explain each fact that formed a basis for the officers' reasonable suspicion," the court stated, "the [S]tate did set forth 'at least a minimal level of objective justification.' " *Id.* (quoting *State v. Timberlake*, 744 N.W.2d 390, 393 (Minn. 2008)). The court agreed with the district court that several facts offered by the State to support the expanded stop were not indicative of criminal drug activity, but the "police officers were able to 'point to something objectively supporting [their] suspicion,' " *id.* (quoting *State v. Britton*, 604 N.W.2d 84, 87 (Minn. 2000)), including reason to believe the vehicle owner had an active felony warrant for possession of controlled substances, the condition of the vehicle's console, the unusually long time it took Lugo to stop, Lugo's recent presence at a known drug house, his own alleged drug possession close in time to the stop, and his unusual statements. *Id.* Together, the court concluded, these facts formed a sufficiently particularized and objective basis for the officers' reasonable, articulable suspicion. *Id.*

We granted review. We will first address Lugo's contention that the court of appeals erred when it applied de novo review to the district court's legal conclusion that no reasonable suspicion supported the dog sniff. Then, applying the proper standard of review

7

to the undisputed facts, we will consider the district court's decision on Lugo's suppression motion.

## I.

The State's ability to appeal in a criminal case is limited. *State v. Rourke*, 773 N.W.2d 913, 923 (Minn. 2009) (citing *In re C.W.S.*, 267 N.W.2d 496, 498 (Minn. 1978)). Either a statute or court must permit the appeal, or the issue raised must "arise by necessary implication" from an issue where the State's right to appeal is expressly provided. *Id.* The rules governing appeals by the State in criminal cases are strictly construed because such appeals are not favored. *Id.* (citing *State v. Barrett*, 694 N.W.2d 783, 785-87 (Minn. 2005)).

In this case, the State's appeal is authorized by Rule 28.04, subdivision 1(1), of the Minnesota Rules of Criminal Procedure. With certain exceptions not pertinent here, subdivision 1(1) permits the State to appeal as of right from "any pretrial order, including probable cause dismissal orders based on questions of law." Minn. R. Crim. P. 28.04, subd. 1(1). The alleged error must "have a critical impact on the outcome of the trial." Minn. R. Crim. P. 28.04, subd. 2(2)(b).

This case presents the question of what we meant in *Webber*, when we said that, on a State appeal from a pretrial order, "this court will only reverse the determination of the trial court if the state demonstrates clearly and unequivocally that the trial court has erred in its judgment and that, unless reversed, the error will have a critical impact on the outcome of the trial." 262 N.W.2d at 159. The parties agree that, because the district court's order resulted in the dismissal of two of the three charges against Lugo, the State

8

has demonstrated "critical impact." The parties disagree on the meaning of the requirement that the State "demonstrate[] clearly and unequivocally that the trial court has erred in its judgment."

A.

We interpret rules of procedure de novo and follow a rule's plain language when it is unambiguous. *Jaeger v. Palladium Holdings, LLC*, 884 N.W.2d 601, 605 (Minn. 2016). "Ambiguity exists only if the language of a rule is subject to more than one reasonable interpretation." *Walsh v. U.S. Bank, N.A.*, 851 N.W.2d 598, 601 (Minn. 2014).

At no point does Rule 28.04 use or imply the phrase "clearly and unequivocally erroneous." Subdivision 1(1) gives the prosecutor the right to appeal "from any pretrial order," with certain exceptions, not just "clearly and unequivocally erroneous" orders.

Likewise, subdivision 2(2)(b) requires that the prosecutor provide only "a summary statement . . . explaining how the district court's alleged error, unless reversed, will have a critical impact on the outcome of the trial . . . ." Thus, although the prosecutor must explain the "critical impact on the outcome," the error need only be "alleged." There is no requirement to explain the alleged error in detail, much less to show a "clear and unequivocal" error. In other words, the origin of the "clearly and unequivocally erroneous" phrase is *Webber*, not Rule 28.04 or its predecessor. The phrase has no textual basis in the rule.

In this case, the State complied with the plain language of Rule 28.04. In its statement of the case for the appeal, the State alleged the error—the district court's suppression of evidence despite the officers' reasonable, articulable suspicion—and

9

explained the alleged error's critical impact on the case. The text of Rule 28.04 required nothing more.

B.

Our statement in *Webber* goes beyond the plain language of Rule 28.04 and suggests that the State must satisfy a two-prong test: a "critical impact" prong and an "erred" prong. We have had several occasions since we decided *Webber* to explain and apply the "critical impact" prong.[1] In contrast, over a period of almost four decades, we have never explained the "erred" prong.

*Webber* itself sheds no light on what its "erred" prong means and how it should be applied. *See* 262 N.W.2d at 159 (cautioning that our refusal to reverse the district court should not be construed as "the equivalent of an affirmance of that order or an acceptance of the reasoning upon which the decision is based"). As is clear from our discussion above, the "erred" prong most certainly does not come from the text of the Rule 28.04. Nor have we found any counterpart to it in Minnesota statutes, case law, or other rules.

The parties disagree on the meaning of the "erred" prong in *Webber*. Lugo contends that the "erred" prong requires that the State demonstrate that "the district court judge acted

---

[1]      *See, e.g.*, *State v. Joon Kyu Kim*, 398 N.W.2d 544, 551 (Minn. 1987) (clarifying that the *Webber* critical-impact requirement does not require the State to show that the lack of the suppressed evidence "completely destroys" its case; it is enough that the lack "significantly reduces the likelihood of a successful prosecution"); *State v. Zanter*, 535 N.W.2d 624, 631 (Minn. 1995) (holding that critical impact is a threshold issue that must be determined first, before deciding whether the suppression order was made in error); *State v. Edrozo*, 578 N.W.2d 719, 722-23 (Minn. 1998) (further emphasizing *Zanter*'s change to the sequence in which error and critical impact must be addressed).

contrary to or unreasonably applied law clearly established by the Minnesota Supreme Court." Lugo seems to posit that if an issue of law decided by the district court against the State is a close call, we should not make the call ourselves, but should defer to the district court's legal conclusion. This interpretation of the "erred" prong, Lugo argues, furthers Minnesota's long-standing policy disfavoring prosecution pretrial appeals by discouraging "frivolous or borderline-meritorious appeals." Lugo also maintains this rule of deference is consistent with the approach we have taken in cases in which the State has appealed a pretrial order suppressing a defendant's statements because of a *Miranda*[2] violation. He urges us to adopt the standard we articulated in *State v. Champion*, which requires "considerable, but not unlimited, deference to a trial court's fact- specific resolution of [a legal] issue when the proper legal standard is applied." 533 N.W.2d 40, 44 (Minn. 1995).

The State contends that, as a general rule, the appellate standard of review depends on the type of issue presented on appeal, not on the identity of the party presenting the issue. The State argues that *Webber* sets forth a burden of proof for the prosecution, not a standard of review for the court. The State further asserts that *Champion* does not require an appellate court to defer to a trial court's conclusions of law. And finally, the State maintains that Lugo's proposed rule of law is inconsistent with this court's precedent, which has always applied the de novo standard of review to questions of law raised in State pretrial appeals.

---

[2]     *See Miranda v. Arizona*, 384 U.S. 436 (1966).

11

At the outset, we reject the State's argument that the "erred" prong of *Webber* creates a burden of proof. Typically, burden of proof relates to a disputed issue of fact. That is not the case here. Nor does *Webber* support the notion, advanced by the State only at oral argument, that there is a burden of production, requiring the State to make some threshold showing of legal error. Rule 28.04 requires a "summary statement" by the State explaining critical impact, but it contains no similar requirement with respect to the district court's alleged error. Minn. R. Crim. P. 28.04, subd. 2(b).

Having rejected the State's proposed interpretation, we turn to Lugo's argument that *Webber*'s "erred" prong established a deferential standard of review on pretrial State appeals, even as to legal issues. As a review of our case law shows, that was not our intention. In fact, we have on several occasions rejected that approach.

For example, in one of our earliest post-*Webber* decisions, *State v. Anderson*, we reversed the court of appeals' holding that the State did not show critical impact, and remanded to that court to address the admissibility of the confession that the district court had suppressed. 396 N.W.2d 564, 564 (Minn. 1986). We provided guidance for the court of appeals on remand, stating that "[i]n a case such as this the trial court's duty is to resolve the testimonial disputes as to the historical facts, and the appellate court's duty is to independently determine, on the basis of all factual findings that are not clearly erroneous, whether or not the confession was voluntary." *Id.* at 565 (emphasis added) (citing *Miller v. Fenton*, 474 U.S. 104 (1985)). An independent determination is not deference.

We were even more explicit in rejecting a deferential standard of review on legal issues in *State v. Storvick*, 428 N.W.2d 55 (Minn. 1988), decided two years later. In

12

affirming the district court's suppression of evidence seized during a warrantless search, the court of appeals stated that, under *Webber*, "[t]he [S]tate must meet a heavy burden to sustain a warrantless search, and we must affirm trial court judgment on the question which is not clearly wrong." *State v. Storvick*, 423 N.W.2d 398, 402 (Minn. App. 1988). We reversed the lower courts' conclusion that the search was not supported by exigent circumstances, 428 N.W.2d at 56, and added:

> Although not a factor in our decision to reverse the court of appeals, we note that the court of appeals said at one point in its opinion that it must affirm the trial court in a case such as this if the trial court's decision is not 'clearly wrong.' . . . The 'clearly erroneous' test is the test that would be properly used in the first instance if the trial court had rejected some of the officers' testimony. *The correct approach in a case where the facts are not significantly in dispute is to simply analyze the testimony of the officers and determine if, as a matter of law, the officers were justified under the cases in doing what they did*.

428 N.W.2d at 58 n.1 (emphasis added) (citations omitted).

We took a similar approach in *State v. Othoudt*, 482 N.W.2d 218 (Minn. 1992), on an issue of warrantless arrest. In affirming a district court's pretrial order suppressing evidence, the court of appeals cited *Webber*, emphasizing that its review of pretrial State appeals was "clearly defined and limited." *State v. Othoudt*, 469 N.W.2d 321, 324 (Minn. App. 1991). We, too, affirmed the district court's suppression order, but we stated that because the facts were not in dispute, we would "independently review" those facts and "determine, as a matter of law, whether the evidence need be suppressed." *Othoudt*, 482 N.W.2d at 221. Again, independent review is not deference.

Even in those cases in which we have cited *Webber* as requiring the State to demonstrate "clear and unequivocal error," careful review of our analysis shows no

deference to the district court's legal conclusions.  For example, in *State v. Pike*, 551 N.W.2d 919, 921 (Minn. 1996), quoting *Webber*, we framed the issue as "whether the district court was 'clearly and unequivocally' erroneous" in suppressing evidence.  But we went on to conduct an independent review of the facts known to the investigating officer to conclude that the officer's stop of the defendant's vehicle was supported by a reasonable, articulable suspicion.  *Id.* at 922.  *See also State v. Horner*, 617 N.W.2d 789, 795 (Minn. 2000) (conducting a de novo review of the legal issue of whether probable cause to arrest existed); *Edrozo*, 578 N.W.2d at 723-26 (conducting an independent review and reaching our own legal conclusions with respect to the admissibility of the defendant's statements to police).

Finally, weighty reasons of judicial policy undermine Lugo's argument that we should defer to district courts on constitutional issues "such as probable-cause and reasonable-suspicion determinations."  *State v. Chavarria-Cruz*, 784 N.W.2d 355, 364 (Minn. 2010).  "[T]he legal rules for probable cause and reasonable suspicion acquire content only through application.  Independent review is therefore necessary if appellate courts are to maintain control of, and to clarify, the legal principles."  *Ornelas v. United States*, 517 U.S. 690, 697 (1996); *Chavarria-Cruz*, 784 N.W.2d at 364.  In addition, "*de novo* review tends to unify precedent and will come closer to providing law enforcement officers with a defined 'set of rules which, in most instances, makes it possible to reach a correct determination beforehand as to whether an invasion of privacy is justified in the interests of law enforcement.' " *Ornelas*, 517 U.S. at 697-98 (quoting *New York v. Belton*, 453 U.S. 454, 458 (1981) (internal quotation marks omitted)).

14

C.

Lugo resists this body of case law decided after *Webber* by relying primarily on the 1995 case of *Champion*, in which we considered the State's pretrial appeal of a district court order suppressing certain statements made by the defendant during police questioning. The district court had held that the defendant's interrogation, which was noncustodial at its outset, "became custodial in nature" before he received a *Miranda* warning. *Champion*, 553 N.W.2d at 44. We noted that the district court "used the proper legal standard" in reaching a "fact-specific determination" on the legal issue of custody. *Id.* We acknowledged that individual members of the court "might well have resolved the dispute differently," but held nonetheless that the district court did not clearly err. *Id.* "We give considerable, but not unlimited, deference to a trial court's fact-specific resolution of such an issue," we explained, "when the proper legal standard is applied." *Id.*

*Champion* does not cite *Webber*. Nor does *Champion* support the notion that appellate courts must defer to the district court's *legal* conclusions in State pretrial appeals. We read *Champion* to have applied factual deference, not legal deference. Further, we have not applied *Champion*'s purported deferential standard of review in any other pretrial State's appeal.[3] In fact, all five subsequent opinions in which we have cited *Champion*'s "considerable, but not unlimited, deference" language, were direct appeals by the

---

[3] We have cited *Webber* and *Champion* together in the same case on only one occasion. In that case, *State v. Scott*, we cited *Champion*, not for a deferential standard of review, but for the general rule that "a failure to give a required *Miranda* warning does not render involuntary any subsequent statement made after the giving of a *Miranda* warning." 584 N.W.2d 412, 419 (Minn. 1998).

15

*defendant* from a judgment of conviction. *See State v. Horst*, 880 N.W.2d 24, 31 (Minn. 2016); *State v. Sterling*, 834 N.W.2d 162, 167-68 (Minn. 2013); *State v. Scruggs*, 822 N.W.2d 631, 637 (Minn. 2012); *State v. Heden*, 719 N.W.2d 689, 694-95 (Minn. 2006); and *State v. Staats*, 658 N.W.2d 207, 211 (Minn. 2003). All five cases concerned *Miranda* issues.[4] Our decision in *Champion* simply did not establish a universal standard of deferential review for legal issues in State pretrial appeals.

Accordingly, we conclude that our decision in *Webber* was not intended to, nor did it, announce a rule of deference to district court pretrial legal conclusions that the State has appealed. To the extent the "erred prong" in *Webber* suggests the contrary, it is overruled.

Lugo predicts that this holding will significantly increase "frivolous or borderline-meritorious" pretrial appeals by the State, thereby undermining defendants' speedy-trial rights. To be clear, our holding, which is based on the plain language of Rule 28.04, does not cast doubt on our long-standing precedent that pretrial appeals in criminal cases are not favored. Further, prosecutors know that a pretrial appeal brings with it the county's obligation to pay the defendant's attorney fees. *See* Minn. R. Crim. P. 28.04, subd. 2(6). Prosecutors know that, typically, evidence does not get better with age. Finally, prosecutors know that baseless pretrial appeals can result in sanctions and professional discipline.

---

[4] In *Horst*, we articulated a "considerable, but not unlimited, deference" standard of review and then independently reviewed both the undisputed facts and the district court's legal conclusion regarding whether the interrogation was custodial, before "reach[ing] the same conclusion as the district court." *Horst*, 880 N.W.2d at 31.

16

II.

Having established the correct standard of review, we turn now to whether the district court's suppression order reached the correct legal conclusion. The question is whether law enforcement officers had a reasonable, articulable suspicion to conduct a dog-sniff of the exterior of Lugo's vehicle. Lugo has not challenged the initial stop, his temporary detention in the squad car, or police questioning during that detention. He challenges only the court of appeals' determination that Joswiak had a reasonable, articulable suspicion that Lugo was engaged in drug-related criminal activity sufficient to expand the scope of the initial stop.

A.

The United States and Minnesota Constitutions prohibit unreasonable searches and seizures. U.S. Const. amend. IV; Minn. Const. art. I, § 10. Searches and seizures conducted without warrants are presumptively unreasonable. *Othoudt*, 482 N.W.2d at 221-22. An exception to the warrant requirement permits a police officer to "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *State v. Timberlake*, 744 N.W.2d 390, 393 (Minn. 2008) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). While the use of a trained narcotics-detection dog to sniff the exterior of a motor vehicle that has been lawfully seized is not a "search" requiring probable cause under either the Fourth Amendment or the Minnesota Constitution, a police officer must have "a reasonable, articulable suspicion of drug-related criminal activity before law enforcement may conduct a dog sniff around a motor vehicle" lawfully stopped for some other reason. *State v. Wiegand*, 645 N.W.2d 125, 135 (Minn.

17

2002). *See Rodriguez v. United States*, ___ U.S. ___, ___, 135 S. Ct. 1609, 1616 (2015) (stating that police may not routinely extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff).

Reasonable suspicion is " 'a particularized and objective basis' for suspecting the particular person stopped of criminal activity." *See Ornelas*, 517 U.S. at 696 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). "The reasonable-suspicion standard is not high." *State v. Morse*, 878 N.W.2d 499, 502 (Minn. 2016) (quoting *State v. Diede*, 795 N.W.2d 836, 842-43 (Minn. 2011)) (internal citation and quotation marks omitted). It is enough that a law enforcement officer can articulate specific facts which, taken together with rational inferences from those facts, objectively support the officer's suspicion. *State v. Davis*, 732 N.W.2d 173, 182 (Minn. 2007) ("[R]easonable suspicion requires' something more than an unarticulated hunch, [and] that the officer must be able to point to something that objectively supports the suspicion at issue.' " (quoting *State v. Wasson*, 615 N.W.2d 316, 320 (Minn. 2000))). An assessment of reasonable suspicion must be based on "the totality of the circumstances—the whole picture," *Cortez*, 449 U.S. at 417, and a trained police officer is entitled to draw inferences and deductions "that might well elude an untrained person." *Id.* at 418; *Morse*, 878 N.W.2d at 502.

Whether there is reasonable suspicion is a mixed question of fact and constitutional law. *Chavarria-Cruz*, 784 N.W.2d at 364. When reviewing a district court's determinations of the legality of a limited investigatory stop, "the district court's findings of fact will not be set aside unless they are clearly erroneous." *Morse*, 878 N.W.2d at 502 (citing *Gauster*, 752 N.W.2d at 502). Then, the court " 'review[s] questions of reasonable

18

suspicion de novo.' " *Id.* (quoting *Britton*, 604 N.W.2d at 87). *See also State v. Williams*, 794 N.W.2d 867, 871 (Minn. 2011) ("When facts are not in dispute, as here, we review a pretrial order on a motion to suppress de novo and 'determine whether the police articulated an adequate basis for the search or seizure at issue.' " (quoting *Flowers*, 734 N.W.2d at 247-48)).

B.

Here, the facts are undisputed, so we apply de novo review. Based on the totality of the circumstances, we hold that there was a reasonable, articulable suspicion to expand the search.

We agree with the district court's determination that, on the record before it, the "lived-in" appearance of the vehicle and the removal of the vehicle's center console were not indicative of drug-related activity. Therefore, we do not consider these facts. But the remaining undisputed facts establish reasonable suspicion.

First, Lugo was observed leaving a house that was known to be connected with controlled substances and that was under active surveillance. This was more than mere presence "in a neighborhood frequented by drug users, standing alone." *See Brown v. Texas*, 443 U.S. 47, 51-52 (1979). Presence in a known drug house is a relevant, but not conclusive, factor for an officer to consider. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (stating "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.").

19

Second, Lugo took an unusually long time to stop. When he finally did, he leaned over in his seat, as though he was trying to hide something. This kind of behavior is relevant in a reasonable-suspicion analysis. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975).

Third, Lugo had recently been arrested for fleeing an officer and for drug possession. Arrests not resulting in conviction may be considered when the arrest was for an offense of the same general nature. *See State v. Yarbrough*, 841 N.W.2d 619, 623-24 (Minn. 2014) (noting that the defendant's prior arrest contributed to the overall finding of probable cause).

Fourth, Lugo lied about the identity of the car's owner. *See Britton*, 604 N.W.2d at 89 (stating that attempts to conceal vehicle ownership can be suggestive of ongoing criminal activity). The significance of this misrepresentation was enhanced because the car's real owner had previously been arrested for a drug crime and drug paraphernalia had been found in that vehicle.

Finally, and tellingly, Lugo said, "man just take me to jail, please." This remark suggests consciousness that he had committed a crime.

As a matter of law, these undisputed facts, considered in their totality, objectively constitute a reasonable, articulable suspicion of drug activity that supported the expansion of the vehicle stop to include a dog-sniff. Accordingly, the district court erred in suppressing the drug evidence discovered as a result of the dog-sniff and the ensuing search, and in dismissing the two drug-related charges.

20

Affirmed.


CHUTICH, J., took no part in the consideration or decision of this case.


MCKEIG, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

# CONCURRENCE

STRAS, Justice (concurring).

I concur only in the judgment of the court.