**STATE of Minnesota, petitioner, Appellant,**

v.

**Daniel Thomas MARTINSON, Respondent.**

**No. C1–96–1947.**

Supreme Court of Minnesota.

July 16, 1998

Hubert H. Humphrey III, Attorney General, Paul R. Kempainen, Assistant Attorney General, St. Paul, for Appellant.

John M. Stuart, Minnesota State Public Defender, Chad M. Oldfather, Timothy C. Rank, Faegre & Benson, Minneapolis, for Respondent.

## OPINION

TOMLJANOVICH, Justice.

This case arises from the detention and arrest of Daniel Thomas Martinson who was charged with six counts of drug possession and trafficking offenses. Martinson filed a motion to suppress the drugs seized as a result of his detention and arrest. The trial court denied Martinson's pretrial suppression motion, and Martinson waived a jury trial and allowed the trial court to decide the case

on the basis of stipulated facts. The trial court found Martinson guilty of a first-degree controlled substance crime and sentenced him to 54 months in prison.[1] The court of appeals reversed Martinson's conviction in an unpublished opinion because it believed the trial court erred in denying the suppression motion. Concluding that the district court did not err in denying Martinson's motion, we reverse the decision of the court of appeals and reinstate Martinson's conviction.

The following are the facts as stipulated. On June 2, 1995, several narcotics officers were observing passengers arriving at the Minneapolis/St. Paul Airport from Las Vegas, Nevada in the baggage claim area because the officers knew from past experience that passengers coming from this city had often been found in possession of drugs. Before this date, none of the officers knew anything about Martinson, nor did they have any reason to suspect or target him because they had no reason to expect his arrival at the airport.

Officer Staber first noticed Martinson as he was coming down the escalator to the baggage claim area because he was "carrying a duffel bag with a shoulder strap over his shoulder very tightly, almost like a football." Staber then noticed that Martinson did not stop at Carousel 14 where the checked luggage from Martinson's plane was arriving and assumed that Martinson was leaving the airport and only had carry-on luggage. Staber testified that he continued to watch Martinson because one of the things that drug enforcement officers watch for is people who travel with only carry-on luggage. Staber watched as Martinson paused in the area of Carousel 12, went to the restroom, and then returned to the area of Carousel 14 to wait for his luggage. Staber noted that Martinson seemed "agitated" and "upset" and did not "remain in one place" but paced around the carousel unlike the other passengers.

When Martinson's luggage arrived, Staber saw that Martinson retrieved one hard-sided bag that measured approximately 2½ feet ×

1 foot × 8 inches and had wheels and a handle. Staber found this "unusual" because the bag was small enough to be carried on the plane. Based on these observations, Staber and Officer Giller approached Martinson. Staber displayed his badge and identification and told Martinson that he was a member of the Airport Narcotics Interdiction Unit and asked Martinson if he could speak with him. Staber told Martinson that he was not under arrest or being detained. Staber asked Martinson where he was coming from, and Martinson first said Arizona, then corrected himself and said Las Vegas. Martinson had actually flown to Minneapolis from Phoenix, via Las Vegas. Staber then asked to see Martinson's airline ticket. Martinson began removing a Northwest Airlines ticket folder from his duffel bag, but then pushed that ticket folder back into the duffel bag and removed an America West ticket folder from a different pocket on the duffel bag. The America West ticket was a one-way ticket paid for in cash from Phoenix to Minneapolis, via Las Vegas. Staber stated that, in his experience, most drug carriers travel using one-way tickets paid for in cash.

Staber asked Martinson for some identification and Martinson produced a certified copy of his birth certificate. Martinson did not have photo identification or any other identification with his address on it, which Staber found "unusual," although photo identification was not required for airline travel at that time. Staber then asked to see the Northwest Airlines ticket folder, and it contained a one-way ticket from Minneapolis to Phoenix dated May 31, 1995—just two days earlier. Both airline tickets and the birth certificate had consistent information with regard to Martinson's identification, except the America West ticket misspelled his name "Martanson". Staber asked Martinson the purpose for his trip to Arizona, and Martinson stated that he had gone for a job interview. Staber found the ticket situation suspicious because he assumed that it would have been more economical to purchase a round-trip ticket and because, in his experi-

1. Martinson was found guilty of importing cocaine across state borders. This was the charge carrying the heaviest penalty (a possible 35 year sentence and/or a fine of $1,250,000). *See* Minn. Stat. § 152.0261, subd. 3 (1996). However, the trial court exercised its discretion and granted a downward departure from the sentencing guidelines in sentencing Martinson to only 54 months.

ence, drug couriers often travel and return on different airlines to conceal their travel itineraries.

Staber then asked Martinson if he would consent to a search of his luggage, and Martinson refused, putting the strap of his duffel bag over his shoulder and "look[ing] as if he was about to walk away." At this point, Staber informed Martinson that he was being detained until a narcotics dog could examine his luggage. There was a dog present at the airport, and it normally only takes a few minutes for the dog to arrive once the radio request is made. Staber admitted that at this point he did not have probable cause to arrest·Martinson.

Martinson asked if he could have a cigarette while waiting for the dog to arrive, and Staber and Officer Tyndall escorted him outside so that he could smoke, while Officer Giller remained with the luggage. Once outside, Martinson asked why he had been stopped, and Staber told him that they looked for passengers with certain characteristics who denied permission to search luggage. Staber also told Martinson that they were not interested in people carrying small amounts of drugs for personal use. At this point, Martinson pulled up his pants leg and removed a small syringe from his sock and handed it to Staber. Staber asked what the syringe was for, and Martinson replied, "I just got into this shit." Martinson then pulled out a small glass vial from his pants pocket, stating that it was "crystal meth."

Staber then told Martinson that he was under arrest for possession of a controlled substance. Martinson then threw the vial and attempted to run but was subdued and arrested. While these events were taking place outside the airport, the narcotics dog had arrived and Giller indicated the two pieces of luggage to be examined by the dog. The dog noted the presence of controlled substances in the duffel bag, but did not get to inspect the hard-sided bag because of the scuffle outside with Martinson. The officers inside went outside to the area of the scuffle, leaving Martinson's bags unattended for an undetermined amount of time. None of the officers know·for sure if the dog ever sniffed the hard-sided bag.

After Martinson's arrest, Staber applied for and obtained a search warrant for both of the bags. The application for the search warrant noted the dog's positive alert to the presence of a controlled substance. Staber found nothing illegal in the duffel bag, but found 1000 grams of cocaine and 297 grams of methamphetamine in the hard-sided bag.

Martinson filed a motion to suppress the evidence obtained during his detention and arrest on the basis that the evidence was unconstitutionally obtained in violation of the Fourth Amendment of the U.S. Constitution. A *Rasmussen* hearing was held in which the trial court denied Martinson's motion and determined that the evidence was not unconstitutionally obtained and would be admissible at trial.

After Martinson was found guilty of a first-degree controlled substance crime, Martinson appealed the judgment to the court of appeals, which reversed the conviction, finding that Martinson's detention was unconstitutional because the officers did not have "reasonable suspicion" to justify conducting a brief investigative stop. The state then appealed to this court. We are now required to decide whether the narcotics officers had an objective reasonable suspicion justifying the investigative stop of Martinson and his luggage.

■ When the facts are undisputed and the trial court's decision is a question of law, this court exercises de novo review. *State v. Paul,* 548 N.W.2d 260, 264 (Minn.1996); *see also Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (stating that "determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal").

■ The Fourth Amendment to the U.S. Constitution and Article I, Section 10 of the Minnesota Constitution protect a person's right to be free from unreasonable searches and seizures, providing that a person may be searched if the search is preceded by probable cause and the issuance of a warrant. *See Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, the U.S. Supreme Court has held that an investigatory seizure is constitutional in the absence of

probable cause and a warrant if the police officer can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. 1868. Similarly, this court has held that "[a] brief investigatory stop requires only reasonable suspicion of criminal activity, rather than probable cause." *State v. Pike*, 551 N.W.2d 919, 921 (Minn.1996) (citing *Terry*, 392 U.S. at 21–22, 88 S.Ct. 1868).

■ A "seizure" has taken place for Fourth Amendment purposes when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."[2] *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). However, it should be noted that:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification.

*Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (citations omitted).

■ If a person has been "seized" without probable cause and/or a warrant, the police officer must then set forth the basis for his/her reasonable suspicion that the person was engaging in some criminal activity. *Terry*, 392 U.S. at 21, 88 S.Ct. 1868. Reasonable suspicion is not easily defined nor is it "readily, or even usefully, reduced to a neat set of legal rules." *Ornelas*, 517 U.S. at 695–96, 116 S.Ct. 1657 (quoting *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527

(1983)). The U.S. Supreme Court has described reasonable suspicion as " 'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Id.* at 696, 116 S.Ct. 1657 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). Furthermore, reasonable suspicion requires that the police officer "be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch." ' " *United States v. Sokolow*, 490 U.S. 1, .7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. 1868). "The principal components of a determination of reasonable suspicion * * * will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion." *Ornelas*, 517 U.S. at 696, 116 S.Ct. 1657.

Brief investigatory seizures (hereinafter *Terry* stops) have been justified in an airport setting because of "the 'public interest involved in the suppression of illegal transactions in drugs or of any · other serious crime.' " *Florida v. Rodriguez*, 469 U.S. 1, 5, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984) (quoting *Florida v. Royer*, 460 U.S. at 498–99, 103 S.Ct. 1319). The U.S. Supreme Court has also indicated that a person has a lower expectation of privacy in a major international airport primarily because of the extensive antihijacking surveillance and equipment which, arguably, may make a determination of reasonable suspicion somewhat easier to articulate in an airport than in some other setting. *Id.* at 6, 105 S.Ct. 308.

In efforts to prevent the transport of illegal drugs, federal agents and other law enforcement officers have developed drug courier profiles, which consist of several characteristics that officers believe to be consistent with a person engaged in drug trafficking.[3] 4 Wayne R. LaFave, *Search*

---

**2.** Martinson was seized for Fourth Amendment purposes when Staber informed him that he was not free to leave until a narcotics dog could examine his luggage.

**3.** Some of the characteristics considered to fit the drug courier profile are: (1) traveling to or

from a "major source city"; (2) leaving the plane last; (3) carrying no luggage; (4) changing flights en route; (5) purchasing tickets with cash; (6) using a false name on the ticket; (7) buying tickets shortly before the time of departure; (8) continually looking back while passing through

*and Seizure: A Treatise on the Fourth Amendment* § 9.4(e), at 166 (3d ed.1996). Since it is obvious that the officers in this case were relying, at least in part, on so-called drug courier profiles, we direct our attention to the use of such profiles. In *State v. Williams*, 525 N.W.2d 538, 547–48 (Minn.1994), we held that the prosecutor could not elicit drug courier profile evidence during the state's case-in-chief at trial on the issue of the defendant's guilt. However, this case does not implicate *Williams* because the issue in *Williams* was not whether police acted appropriately in approaching the defendant and obtaining consent to search, as it is in the instant case. *Williams* only implicates the manner in which drug courier profile evidence may be used at trial.

■ While we are extremely reluctant to rely solely upon a drug courier profile for purposes of asserting reasonable suspicion, the U.S. Supreme Court has stated that: "A court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion, but the fact that these factors may be set forth in a 'profile' does not somehow detract from their evidentiary significance as seen by a trained agent." *Sokolow*, 490 U.S. at 10, 109 S.Ct. 1581. Therefore, even if many of the characteristics relied upon by the investigating officers can be labelled as factors found in a drug courier profile, these factors must still be considered in their totality when determining reasonable suspicion.

■ In the instant case, the state argues that the narcotics officers had sufficient reasonable suspicion to detain Martinson and conduct a *Terry* stop, listing the following articulable facts which the state asserts in their totality amount to reasonable suspicion:

(1) [Martinson] arrived from a source city in the early morning hours on a flight on which previous drug couriers had arrived.

(2) [Martinson's] behavior was unusual: he appeared agitated, unlike the other passengers on his flight he walked past the baggage carousel for his flight, waited by another one and then, when he returned to the correct carousel, he paced about and back and forth to opposite sides of the carousel.

(3) [Martinson] was tightly clutching his black leather duffel bag 'like a football.'

(4) [Martinson's] checked bag was small enough for him to have carried it on the plane, indicating it may have contained items he did not want seen during boarding security checks.

(5) When asked where he was coming from, [Martinson] initially said Arizona and then changed his answer to Las Vegas.

(6) When asked for his ticket, [Martinson] initially started to remove a Northwest ticket envelope which he then attempted to conceal before taking out his America West ticket.

(7) His ticket was a one-way from Phoenix paid for in cash, a practice which the officers knew to be consistent with that of other drug couriers they had arrested.

(8) The only identification [Martinson] could provide was a photocopy of a birth certificate, and [Martinson] was unable to produce any photo identification nor was he able to produce any identification that showed his address.[4]

(9) The officers had no way of verifying at the scene whether the birth certificate was [Martinson's] correct identification.

(10) The Northwest ticket was also a one-way ticket, for travel to Phoenix only two days before.

(11) [Martinson] told the officers that the Northwest ticket was for a different trip

the airport; (9) attempting to avoid police; (10) making inexplicable diversions while walking through the airport; (11) appearing extremely nervous; (12) dressing in an unusual manner; and (13) making false statements about reasons for trip. LaFave § 9.4(e), at 169–72. However, this is not a complete list of all characteristics set forth in the various profiles used by law enforcement officials.

4. Martinson did not produce a photo copy of his birth certificate, but rather a certified copy of his birth certificate according to the trial court's findings of fact. The trial court also notes that photo identification was not required for air travel at the time of Martinson's detention.

than the one he was returning from even though it was for travel only two days before and thus was consistent with the Northwest ticket having been for the outbound leg of the trip from which he had just returned.

(12) It would have been more economical for [Martinson] to have bought one round-trip ticket if he was in fact traveling for only a job interview as he said he was.

(13) The two tickets were for travel on different airlines which the officers knew to be consistent with the practices of drug couriers.

(14) [Martinson] told the officers that he had made several trips to Arizona recently.

(15) [Martinson] told the officers that he had gone to Arizona to look for work which did not seem to fit with his use of one way tickets and his lack of positive identification.

(16) [Martinson] was unusually nervous during the conversation with his hands shaking and his voice trembling.

The state also argues that the court of appeals did not consider the totality of the circumstances when it found that there was no reasonable suspicion to conduct the *Terry* stop. Finally, the state asserts that this is not a drug courier profile case.

In contrast, Martinson argues that the above-stated facts cannot be the basis for reasonable suspicion because they are wholly consistent with innocent activity and even if considered in their totality they do not create suspicion of illegal activity. Martinson also notes that several of the facts relied upon are drug courier characteristics. Martinson further asserts that the officers only conducted the *Terry* stop because he refused to consent to the search of his luggage, which is an impermissible basis for a seizure.

The state is correct in its assertion that a determination of reasonable suspicion requires that the court consider the totality of the circumstances. *See Sokolow,* 490 U.S. at 8, 109 S.Ct. 1581; *Williams,* 525 N.W.2d at 547. However, Martinson is incorrect in his

assertion that facts which are consistent with innocent activity cannot form the basis for reasonable suspicion to justify a *Terry* stop. The U.S. Supreme Court has held that while each individual factor is consistent with innocent travel, all of the factors together may amount to reasonable suspicion, stating: "there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot." *Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980).

We agree with the state's assertion that all of the presented facts in their totality give rise to reasonable suspicion justifying the *Terry* stop. While none of these factors are independently suspicious, the U.S. Supreme Court has clearly stated that "innocent" factors in their totality, combined with the investigating officer's experience in apprehending drug traffickers, can be sufficient bases for finding reasonable suspicion. *Id.* Similarly, we have also stated that "innocent activity might justify the suspicion of criminal activity." *State v. Johnson,* 444 N.W.2d 824, 826–27 (Minn.1989) (citing *Sokolow,* 490 U.S. at 9, 109 S.Ct. 1581). No evidence was presented suggesting that the method of the detention was prolonged or overly intrusive so as to be violative of Martinson's Fourth Amendment rights in any other manner. In sum, the investigating officers used their expertise in apprehending drug traffickers and we hold that, in this particular instance, the officers had reasonable suspicion to suspect Martinson of possession of drugs.

Reversed and judgment of conviction reinstated.

PAGE, Justice (dissenting)

I respectfully dissent. The question before us is whether the officers who stopped Martinson had an objective reasonable suspicion of illegal conduct which justifies the stop. The burden of establishing that the suspicion was objectively reasonable [1] is on the state. And, as the court states, a determination of whether the state has met its burden is to be made by examining the totali-

---

**1.** See *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (to justify a *Terry* stop, the police must "point to specific and artic-

ulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion").

ty of the circumstances as observed by the investigating officers, given the officer's training and experience.[2] It seems to me, however, that to meet its burden, the state must provide some foundation for the officer's claim that the facts relied on, in any given case, create a reasonable suspicion of illegal conduct. That is to say, the state must articulate what it is about the officer's training and experience, coupled with the facts relied on, that creates a reasonable suspicion of illegal conduct. Absent such a showing, how can a reviewing court properly analyze whether the officer's suspicion is reasonable,[3] especially in cases when the officer is relying on conduct which, on its face, appears to be consistent with innocent activity? If any and every combination of acts consistent with legal activity can be used to form the basis for reasonable suspicion of illegal activity, then each and every person walking through an airport is subject to being stopped. I do not believe that the framers of either the United States or the Minnesota Constitutions intended to subject innocent citizens to such governmental intrusions.

In this case, the officers relied on 16 separate facts to support their claim of reasonable suspicion. When viewed individually, the conduct supporting each of these facts appears to involve innocent activity. Viewed in their totality, it is not clear what it is about this collection of apparently innocent acts that suggests that Martinson was engaged in illegal conduct. Requiring the state to offer some foundation, beyond the conclusory statement, that these 16 known facts, coupled with the officers' training and experience, lead to the conclusion that the officers had reasonable suspicion, is not too much to ask. A review of the record here indicates that no such foundation was provided. Therefore, I dissent.

---

**2.** *See United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

**3.** Indeed, when no such showing is made, the state is, in essence, asking the reviewing court to:

"Trust us, we're from the government, we're here to help you."