*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-2092**

State of Minnesota,
Respondent,

vs.

Jesse Louis Puttbrese,
Appellant.

**Filed February 13, 2017
Affirmed
Peterson, Judge**

Chisago County District Court
File No. 13-CR-14-265

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Janet Reiter, Chisago County Attorney, David W. Hemming, Assistant County Attorney, Center City, Minnesota (for respondent)

Mark D. Kelly, St. Paul, Minnesota (for appellant)

Considered and decided by Peterson, Presiding Judge; Hooten, Judge; and Smith, John, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**PETERSON**, Judge

In this appeal from a conviction for possessing methamphetamine, appellant argues that the district court erred in denying his suppression motion because the arresting officer illegally expanded the scope and duration of the traffic stop of the pick-up truck in which appellant was a passenger. We affirm.

## FACTS

At about 1:30 p.m., Minnesota State Trooper Derrick Hagen was parked in the median of Interstate 35 while on patrol in Chisago County. He had a certified narcotics-detection dog with him, and he had received information that one of two vehicles would be traveling northbound on Interstate 35 from the St. Paul area to Chisago County and would possibly be transporting narcotics. Hagen was told that the vehicle would be either a red pick-up truck or a passenger vehicle.

Hagen saw a red Ford F-150 pick-up truck traveling north and began following it. He followed the vehicle for two or three miles and saw it cross the fog line repeatedly and the center line at least twice. He ran a registration check on the truck and learned that the truck's registered owner was a woman whose driver's license had been revoked. A woman was driving the truck.

Hagen activated his squad car's emergency lights, and he testified at the omnibus hearing that it took the truck an "unordinary amount of time" to come to a complete stop. As the truck slowed down, Hagen saw the front-seat passenger bend down and reach forward. Based on his training and experience, Hagen was concerned because "[h]aving

2

the information of the possibility of narcotics also unknowing if they are reaching for a possible weapon or what the actual reason for, I guess, making those movements as they are being pulled over – just the timing."

Hagen approached the passenger side of the truck, and Minnesota State Trooper Brett Westbrook, who had arrived at the scene, approached the driver's side. The driver was identified by her Minnesota driver's license, and the passenger was later identified as appellant Jesse Louis Puttbrese.

The driver was not the truck's registered owner. Hagen testified that her arm was shaking "uncontrollably" when she handed him her driver's license, that she had a visible stomach pulse as she was seated behind the steering wheel, and that she was very talkative. Hagen considered this behavior significant because "[h]aving dealt with individuals in the past in various circumstances, body language, behaviors, things to keep busy, or they may feel by keeping busy it distracts either how they are feeling or me as the officer or any other responding officer as things are okay."

Hagen testified that appellant appeared very disheveled and he was very fidgety with his hands. He was holding a pen that he continually spun around. Hagen saw what he described as "pick marks" on appellant's face, and appellant's eyes were sunken with dilated pupils. Based on his training and experience, Hagen recognized these traits as indicators of stimulant use. When Hagen asked appellant why he reached forward when the truck was being pulled over, appellant said that he jolted forward when the driver braked hard. Hagen testified that this explanation was inconsistent with his observations of the truck as it stopped.

3

Hagen asked the driver and appellant what they were up to, and appellant said that they were going to Mora. Hagen asked the driver to step out of the truck because appellant would interject when Hagen tried to speak with the driver; Hagen also wanted to get insurance information from the driver. Hagen took the driver back to his squad car. The driver told Hagen that she and appellant were going to Mora to visit her uncle in the hospital, but, a short time later, she said that they were going to pick up her uncle and bring him to the hospital. She also said that appellant had to be back in St. Paul for work at three o'clock. Hagen gave the driver a warning for failing to keep the vehicle in its traffic lane and for not having proof of insurance.

While Hagen spoke with the driver, Westbrook spoke with appellant. Westbrook saw that appellant was fidgety and nervous and unable to sit still. Westbrook described appellant as having sunken eyes and sores on his face. During the conversation, which Westbrook described as a casual conversation about the day's events and ownership of the truck, appellant became increasingly nervous. Westbrook testified that, in a routine traffic stop, nervousness typically lessens over time. Based on his training and experience, it appeared to Westbrook that appellant was using some type of substance, possibly a narcotic or stimulant.

Hagen returned to the truck to talk to appellant, and appellant said that they were going to Mora to borrow money from the driver's uncle. Appellant did not say anything about the uncle going to or being in the hospital. When Hagen asked about their plans, appellant said, "[W]e're not doing anything wrong."

4

Hagen returned to his patrol car to talk to the driver about the warning he issued for her driving conduct, and he told her that things were not adding up for him. Hagen asked the driver if she would consent to the truck being searched, and she did not give a definitive answer. She seemed to be trying to evade the question. When asked whether she was responsible for items in the truck, the driver said that her purse was in there. Hagen explained to her that he was going to have his drug-detection dog walk around the truck and that the dog would alert to the odor of narcotics in the truck. The driver indicated that she did not believe that the dog would alert when walking around the truck.

Hagen testified that he decided to walk around the truck with the dog because he believed that appellant and the driver were involved in criminal activity. Hagen testified that this belief was based on

> [m]y observations from the time I turned my lights on, the behavior of both occupants. The passenger reaching for not knowing what and not providing a seemingly explanation that actually made sense. The conflicting stories as to where they were headed and why they were headed there and signs of apparent drug use on the passenger. The driver not wanting to claim responsibility for the contents of the vehicle when asked – not getting a definitive, "No, there's nothing illegal."

Hagen testified that, in his training and experience, it was significant that a person would make a long trip, stop only briefly, and then turn around and return to the original location. Hagen explained that this behavior was significant because drug sales last a short time because people do not want to be caught. He also testified that, "to have the stories not add up as a reason and not being able to make a deadline as to having to come back for work is very odd."

5

Because state patrol policy required that a vehicle have no occupants when a dog sniff is performed, Hagen asked appellant to get out of the truck. Despite being repeatedly asked to get out of the truck, appellant stayed in the truck. Hagen opened the passenger door and saw in plain view a knife under appellant's right thigh. After securing the knife, Hagen removed appellant's seatbelt and saw a type of glass pipe commonly used for smoking methamphetamine on the seat next to appellant's left leg. Appellant physically resisted the troopers' efforts to remove him from the truck, but eventually the troopers gained control of him and handcuffed him. Before placing appellant in a squad car, Westbrook searched him and found a large baggie that contained 51 grams of methamphetamine.

Appellant was charged with two counts of first-degree controlled-substance crime, possession and possession with intent to sell. Appellant moved to suppress the evidence discovered during the searches of his person and the truck, arguing that the initial stop was invalid and that the officers illegally expanded the scope and duration of the stop. The district court denied appellant's motion.

The parties submitted the case to the district court for decision under Minn. R. Crim. P. 26.01, subd. 4. The court found appellant guilty of the possession charge and, at the state's request, dismissed the possession-with-intent-to-sell charge. This appeal followed.

## DECISION

"When reviewing a district court's pretrial order on a motion to suppress evidence, [an appellate court] review[s] the district court's factual findings under a clearly erroneous standard and the district court's legal determinations de novo." *State v. Gauster,* 752

6

N.W.2d 496, 502 (Minn. 2008) (quotation omitted). The existence of a reasonable suspicion to support a limited investigatory stop is a question of law, which is reviewed de novo. *State v. Lugo*, 887 N.W.2d 476, 484, 487 (Minn. 2016).

In Minnesota, the principles and framework of *Terry v. Ohio,* 392 U.S. 1, 88 S. Ct. 1868 (1968), apply when evaluating the reasonableness of seizures during traffic stops even when a minor law has been violated. *State v. Askerooth*, 681 N.W.2d 353, 363 (Minn. 2004). "A *Terry* analysis involves a dual inquiry. First, we ask whether the stop was justified at its inception. Second, we ask whether the actions of the police during the stop were reasonably related to and justified by the circumstances that gave rise to the stop in the first place." *Id.* at 364 (citations omitted). Because appellant does not challenge on appeal the initial stop of the truck, we address the second prong of the inquiry.

> The second *Terry* prong constrains the scope and methods of a search or seizure. An initially valid stop may become invalid if it becomes intolerable in its intensity or scope. Thus, each incremental intrusion during a stop must be strictly tied to and justified by the circumstances which rendered the initiation of the stop permissible. An intrusion not closely related to the initial justification for the search or seizure is invalid under article I, section 10 [of the Minnesota Constitution] unless there is independent probable cause or reasonableness to justify that particular intrusion.

*Id*. (citations and quotations omitted).

> In essence, Article I, Section 10 of the Minnesota Constitution requires that each incremental intrusion during a traffic stop be tied to and justified by one of the following: (1) the original legitimate purpose of the stop, (2) independent probable cause, or (3) reasonableness, as defined in *Terry*. Furthermore, the basis for the intrusion must be individualized to the person toward whom the intrusion is directed.

7

*Id.* at 365. "To be reasonable, the basis must satisfy an objective test: 'would the facts available to the officer at the moment of the seizure * * * warrant a man of reasonable caution in the belief that the action taken was appropriate.'" *Id.* at 364 (quoting *Terry*, 392 U.S. at 21-22, 88 S. Ct. 1868, 1880.

*Expansion of scope and duration of stop*

Appellant argues that Hagen impermissibly expanded the scope of the stop when he re-approached the truck after speaking with the driver in his squad car. Appellant contends that Hagen re-approached the truck because the occupants appeared nervous and because the stopped vehicle was a pick-up truck and, therefore, it was possibly linked to narcotics sales. This suspicion, appellant contends, was not objectively reasonable. But the district court expressly explained that, despite appellant's insistence that the expansion of the stop depended on the tip the troopers received about a pick-up truck transporting narcotics, the court did not rely on the tip as a basis for finding reasonable suspicion.

Instead, the district court relied on Hagen's observation that appellant made a furtive movement before the truck stopped, appellant's explanation for his action was not consistent with Hagen's observations, and appellant showed signs of being under the influence of a stimulant or narcotic. Also, the driver appeared nervous; her arm shook uncontrollably, she had a visible stomach pulse, and she was extremely talkative.

These facts were all noted at the beginning of the stop and justified continuing the investigation. "[B]y virtue of the special training they receive, police officers articulating a reasonable suspicion may make inferences and deductions that might well elude an untrained person." *State v. Flowers*, 734 N.W.2d 239, 251-52 (Minn. 2007). "Law

8

enforcement may continue the detention as long as the reasonable suspicion for the detention remains provided they act diligently and reasonably." *State v. Wiegand*, 645 N.W.2d 125, 135 (Minn. 2002) (quotation omitted).

"[I]nnocent factors in their totality, combined with the investigating officer's experience in apprehending drug traffickers, can be sufficient bases for finding reasonable suspicion." *State v. Martinson*, 581 N.W.2d 846, 852 (Minn. 1998) (quotation omitted); *see also State v. Smith*, 814 N.W.2d 346, 352, 354 (Minn. 2012) (stating that driver's "violent shaking" that appeared to be caused by nervousness and "evasive explanation that he suffer[ed] from a lifelong undiagnosed medical condition" were sufficient to give rise to a reasonable, articulable suspicion and noting manner in which driver's nervousness impacted his physical condition was distinguishable from other cases where nervousness was determined to be insufficient).

As the investigation continued, the driver gave two conflicting stories about her trip to Mora, appellant gave a third, and their time frame for traveling to Mora and getting back to St. Paul allowed for only a brief stop in Mora. Appellant became increasingly nervous during a conversation with Westbrook about the day's events, behavior that Westbrook testified is not typical during a routine traffic stop. Hagen then asked the driver for consent to search the truck. When the driver did not give a definitive answer or take responsibility for items in the truck, Hagen decided to conduct the dog sniff.

The opinions that appellant relies on to argue that Hagen was not justified in asking for consent to search the truck and deciding to conduct the dog sniff involved nervous or suspicious behavior but no conduct that indicated illegal drug or other criminal activity.

9

*See State v. Burbach*, 706 N.W.2d 484, 489-90 (Minn. 2005) (concluding that a tip unsupported by evidence of reliability and a speeding violation, combined with driver's nervousness, were insufficient to support a reasonable, articulable suspicion of illegal drug activity); *State v. Syhavong*, 661 N.W.2d 278, 282 (Minn. App. 2003) ("While an officer's perception of an individual's nervousness may contribute to an officer's reasonable suspicion, nervousness is not sufficient by itself and must be coupled with other particularized and objective facts."); *Wiegand*, 645 N.W.2d at 137 (concluding that dog sniff of a vehicle was not justified when officer believed that driver was acting suspiciously but did not suspect that driver was under the influence of drugs).

In addition to the nervous behavior of both appellant and the driver, appellant bent down and reached forward as the truck slowly came to a stop, appellant's appearance indicated to the troopers that he was under the influence of a narcotic or stimulant, and appellant and the driver told different stories about what they were doing. The totality of these circumstances gave rise to a reasonable suspicion of illegal drug activity and justified Hagen's decision to have his drug-detection dog walk around the truck. Therefore, the district court did not err in denying appellant's motion to suppress the evidence discovered in the truck and on his person.

Because the initial stop and the expansion of the stop were legal, we need not address appellant's argument that the district court erred when it determined that, if the initial stop and the expansion of the stop had not been legal, appellant's resistance to the request that he get out of the truck purged the taint of any prior illegality.

**Affirmed.**

10