*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-1308**

State of Minnesota,
Respondent,

vs.

Wilford John Boyd,
Appellant.

**Filed June 17, 2024**
**Reversed**
**Wheelock, Judge**

Watonwan County District Court
File No. 83-CR-22-521

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Julie M. Kelley, Watonwan County Attorney, St. James, Minnesota; and

Travis J. Smith, Special Assistant County Attorney, Smith & Johnson, Slayton, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, St. Paul, Minnesota; and

Jevon C. Bindman, Jeremy D. F. Krahn, Emilio R. Giuliani, Special Assistant Public Defenders, Maslon LLP, Minneapolis, Minnesota (for appellant)

Considered and decided by Schmidt, Presiding Judge; Slieter, Judge; and Wheelock, Judge.

**WHEELOCK**, Judge

In this direct appeal from appellant's conviction for second-degree sale of a controlled substance, appellant argues that his conviction must be reversed because the district court erred by denying his motion to suppress evidence that was discovered in his vehicle following an unconstitutional dog sniff. Because the objective facts do not establish reasonable, articulable suspicion that controlled substances were in the vehicle, we reverse.

**FACTS**

Around 1:00 a.m. on September 23, 2022, a state trooper observed a vehicle on Highway 60 near Madelia that was driving 45 miles per hour through a construction zone in what is normally a 55-mile-per-hour zone. The trooper followed the vehicle, and after the construction zone ended, the trooper observed the vehicle swerve within its lane and cross the fog line.

The trooper pulled the vehicle over and spoke with appellant Wilford John Boyd through the open driver's-side door because the window would not roll down. While Boyd was searching for his driver's license, the trooper asked Boyd, "Where we heading tonight?" Boyd replied, "I'm coming back, I work for a junker outside Mountain Lake." The trooper commented, "Working late tonight," and Boyd replied, "Yeah, it's that time of year," and said that there had been "a lot of work."

Boyd looked in his backpack, which was on the passenger seat, for his wallet that contained his driver's license. The trooper suspected that Boyd was hiding something from

2

him because Boyd's back was turned away from the trooper in the direction of the passenger seat and the cab of the vehicle was dark because no lights were on in the vehicle. The trooper shined his flashlight into the vehicle toward the backpack. When Boyd could not find his license, he moved the backpack onto his lap, and the trooper used the flashlight to illuminate the backpack. After about 30 seconds, Boyd returned the backpack to the passenger seat, and the trooper shined the flashlight through the back window toward the passenger seat. Boyd eventually found his driver's license in the driver's-side door pocket. Once Boyd found his driver's license, the trooper said, "So, you just been working all day?" Boyd replied, "Yeah, it's been long days."

While Boyd was searching for his license, the trooper noticed a small handheld butane torch in the pocket of the driver's-side door. The trooper knew, based on his training and experience, that this type of torch is commonly associated with the use of controlled substances.

Boyd then looked for proof of insurance in the vehicle but was unable to find it. Boyd explained to the trooper that the vehicle belonged to his employer and that he believed it was insured. Boyd asked the trooper if there was a way for his employer to send the proof of insurance in to law enforcement directly, but the trooper told Boyd that he would prefer that the employer send the proof of insurance to Boyd while they were talking. Boyd called his employer, but the call went unanswered.

The trooper continued to question Boyd about his whereabouts. Boyd explained that he had been working in Lake Crystal earlier in the night, then he visited his son in Madelia. The trooper asked if Boyd was traveling directly from Madelia, and Boyd

3

clarified that he had been in Lake Crystal earlier, then he went to Madelia, then he traveled back toward Lake Crystal to check out a job site but turned around to go home because it was late. The trooper observed that Boyd "refrained from making eye contact or speaking directly to [him]" throughout the exchange.

The trooper then returned to his squad car and called a deputy to request a dog sniff of Boyd's vehicle. The trooper told the deputy that Boyd "was kinda being a little bit shady" and asked the deputy "what you would need or want, or what I need to get from him, to run your dog. Because he's got a backpack in there that he was kind of trying to hide from me as he was looking for his wallet." The deputy told the trooper, "I trust your gut." The trooper also told the deputy about Boyd's description of his whereabouts and that "a lot of stuff's not making sense." The trooper did not mention the butane torch to the deputy.

The trooper and Boyd stood outside while they waited for the deputy, and the trooper continued questioning Boyd about his whereabouts because Boyd's explanation was "not making a whole lot of sense." Boyd explained his whereabouts again, answered all of the trooper's questions directly, and complied with the trooper's instructions. The trooper asked Boyd if he had anything illegal in the vehicle, and Boyd said no. The trooper then explained to Boyd that he called in a dog sniff because of Boyd's driving conduct and because Boyd's story was not making sense. When Boyd stated that he was not intoxicated or impaired, the trooper responded, "Yep, no that's fine." With regard to Boyd's driving conduct, the trooper stated that it made sense given the age and condition of the vehicle and stated, "I get it, people drive slow" and "a little bit more cautious at night."

4

The deputy responded to the scene with a drug-sniffing dog shortly thereafter. The dog sniffed the exterior of the vehicle and indicated the presence of narcotics. The trooper and the deputy searched the vehicle and found a methamphetamine pipe under the driver's seat and cash in the center console. The trooper also searched Boyd's backpack and found an electronic scale, a notebook containing notes that appeared to be sales records, and individually bagged amounts of a substance that later tested positive for methamphetamine. The trooper arrested Boyd.

Respondent State of Minnesota charged Boyd with several controlled-substance offenses. Boyd moved to suppress the evidence found during the search of the vehicle, and after a contested omnibus hearing, the district court denied the motion. The case proceeded to a stipulated-facts trial, and the district court found Boyd guilty of second-degree sale of a controlled substance in violation of Minn. Stat. § 152.022, subd. 1(1) (2022).

Boyd appeals.

**DECISION**

Boyd argues that the district court erred by denying his motion to suppress evidence discovered through the dog sniff because the trooper did not have reasonable, articulable suspicion that drugs may be present in the vehicle.

"When reviewing a district court's pretrial order on a motion to suppress evidence, we review the district court's factual findings under a clearly erroneous standard and the district court's legal determinations de novo." *State v. Gauster*, 752 N.W.2d 496, 502 (Minn. 2008) (quotation omitted). "We may independently review facts that are not in

dispute, and determine, as a matter of law, whether the evidence need be suppressed." *Id.* (quotation omitted).

The United States and Minnesota Constitutions protect "against unreasonable searches and seizures." U.S. Const. amend. IV; Minn. Const. art. I, § 10. A warrantless search is presumptively unreasonable unless it falls within one of the recognized exceptions to the warrant requirement. *State v. Barrow*, 989 N.W.2d 682, 685 (Minn. 2023). "The [s]tate bears the burden of proving any exception." *State v. Milton*, 821 N.W.2d 789, 799 (Minn. 2012). In general, evidence obtained during an unconstitutional search or seizure must be suppressed. *State v. Jackson*, 742 N.W.2d 163, 177-78 (Minn. 2007).

To justify a dog sniff of the exterior of a motor vehicle, police must have "a reasonable, articulable suspicion of *drug-related* criminal activity." *State v. Wiegand*, 645 N.W.2d 125, 135 (Minn. 2002) (emphasis added). An officer must "articulate specific facts which, taken together with rational inferences from those facts, objectively support the officer's suspicion." *State v. Lugo*, 887 N.W.2d 476, 486 (Minn. 2016). In applying this objective standard, appellate courts are "deferential to police officer training and experience," *State v. Britton*, 604 N.W.2d 84, 88 (Minn. 2000), and a "trained police officer is entitled to draw inferences and deductions 'that might well elude an untrained person,'" *Lugo*, 887 N.W.2d at 487 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

Although "the reasonable suspicion standard is not high," it requires "more than an inchoate and unparticularized hunch of criminal activity." *State v. Timberlake*, 744 N.W.2d 390, 393 (Minn. 2008) (quotations omitted). Further, the justification for the suspicion generally cannot be based solely on conduct consistent with the "activities of any multitude

of innocent persons." *State v. Harris*, 590 N.W.2d 90, 100-01 (Minn. 1999). However, "all of the factors together may amount to reasonable suspicion" even if "each individual factor is consistent with innocent travel." *State v. Martinson*, 581 N.W.2d 846, 852 (Minn. 1998).

We evaluate reasonable suspicion based on the totality of the circumstances. *Lugo*, 887 N.W.2d at 486-87. But we may consider the strength of the individual circumstances independently before considering them in their totality. *See id.* at 487-88 (considering the relevance and significance of the objective facts independently before considering them in totality); *State v. Burbach*, 706 N.W.2d 484, 489-91 (Minn. 2005) (concluding that police did not have reasonable suspicion of controlled-substance possession justifying a search of appellant's vehicle and stating that "[e]ach of these factors is weak evidence of drug possession, and they are also weak in the aggregate").

The state argues that the totality of the circumstances supports reasonable, articulable suspicion of drug-related criminal activity, which includes (1) Boyd's description of his whereabouts, which the state claims was inconsistent and did not make sense given that it was approximately 1:00 a.m.; (2) Boyd's conduct while searching his backpack for his driver's license, which led the trooper to conclude that Boyd was trying to hide the contents of the backpack; (3) Boyd's behavior of avoiding eye contact with the trooper during the initial stop; and (4) the presence of the butane torch in the door pocket.

The only circumstance that might indicate drug-related criminal activity is the presence of the butane torch because a butane torch has illegal, drug-related uses. But because a butane torch also has legal uses, it is weak evidence of drug-related criminal

7

activity on its own. We thus analyze whether the remainder of the circumstances "sufficiently supplement" the presence of the butane torch "to make the sum any greater than the parts." *State v. Askerooth*, 681 N.W.2d 353, 369 (Minn. 2004). In doing so, we conclude that the remaining circumstances support nothing more than the typical nervousness a person might exhibit during a traffic stop.

The supreme court "ha[s] been reluctant to rely on nervous behavior as evidence to support a reasonable, articulable suspicion of criminal activity." *Burbach*, 706 N.W.2d at 490; *see also Wiegand*, 645 N.W.2d at 137 (concluding that, without more, "acting suspiciously [was] not an articulable basis to suspect criminal activity"). We have stated that behavior indicating reluctance to interact with police "supports nothing more than a hunch, a mere whim, or a guess" that a person has violated or is about to violate the law. *State v. Davis*, 910 N.W.2d 50, 54 (Minn. App. 2018).

As to Boyd's description of his whereabouts, the state argues that Boyd's explanation contributes to reasonable, articulable suspicion because it was not "entirely consistent" and it did not make sense that Boyd had considered checking out a job site at "odd hours." But Boyd was not changing his story—he was merely clarifying the sequence of events as the trooper continued to press him for information. He answered each of the trooper's questions without hesitation and volunteered additional details to explain his route and the reasons for it. It is not unreasonable to give a simple description of one's whereabouts at the very beginning of a traffic stop instead of explaining the entire timeline of one's movements. Regarding Boyd's claim that he had planned to visit a job site late at night, Boyd explained that it was "that time of year" and that it had "been long days."

Boyd's explanation of his whereabouts was consistent as a whole. His explanation and the manner in which he provided it are weak evidence of drug-related criminal activity.

Next, the state argues that the manner in which Boyd searched his backpack for his driver's license contributes to reasonable, articulable suspicion because it supports the inference that Boyd was trying to conceal the contents of his backpack from the trooper. The trooper found Boyd's conduct suspicious because, although it would have been easier for Boyd to see into his backpack if he had moved it into the light, Boyd nevertheless turned his back away from the trooper and searched his backpack in the dark cab of the vehicle. The state seems to suggest that, if Boyd had nothing to hide, he would have moved his backpack into his lap sooner and opened it up so that the trooper could use the flashlight to see into it. But even if searching in the dark may not have been the most efficient way to find the license, it is not unusual behavior to dig through a bag to locate a wallet; moreover, mildly irrational behavior is not atypical when a person is nervous. And any concern that Boyd was trying to conceal the contents of his backpack should have been dispelled when Boyd moved the backpack onto his lap, where the trooper could see into it with the flashlight. Boyd diligently searched for his driver's license and proof of insurance and even called his employer after 1:00 a.m. to cooperate with the trooper's requests. Therefore, the manner in which Boyd chose to look through his backpack is weak evidence of drug-related criminal activity.

Next, the state argues that Boyd's demeanor contributes to reasonable, articulable suspicion because Boyd "avoided eye contact with the trooper and would not speak directly to the trooper." In *Wiegand*, the supreme court determined that an officer did not have

9

reasonable, articulable suspicion of drug-related criminal activity justifying a dog sniff when the officer testified that the defendant was "evasive, nervous and had glossy eyes," but the officer did not suspect that the defendant "was under the influence of anything." 645 N.W.2d at 137. In *Burbach*, the supreme court reached the same conclusion despite officer testimony that the defendant was "nervous, fidgety, and talkative in a way that the officer found more extreme than usual" and that the defendant's "nervousness was significantly more than normal nervousness during a traffic stop." 706 N.W.2d at 490. In *State v. Fort*, the supreme court determined that officers were not justified in asking to search a vehicle when the defendants were driving in a "high drug area," acting nervous, and avoiding eye contact. 660 N.W.2d 415, 418-19 (Minn. 2003).

Here, similar to the officer in *Wiegand*, the trooper never stated that he suspected Boyd was under the influence of anything; he even acknowledged Boyd's statement that he was not intoxicated. And the evidence of nervousness is weaker than in *Burbach*; here, there is no officer testimony indicating that Boyd's nervousness was uncharacteristic of normal nervousness during a traffic stop. The body-camera footage shows Boyd trying to look in the trooper's direction but squinting in the light of the trooper's flashlight. Boyd was also looking elsewhere throughout the exchange because he was searching the vehicle for his driver's license and proof of insurance, all while answering the trooper's questions in a consistent and forthcoming manner. We discern nothing suspicious about where Boyd was or was not looking during his conversations with the trooper. Therefore, Boyd's demeanor during the traffic stop is weak evidence of drug-related criminal activity.

Viewed objectively, the totality of the circumstances, together with the reasonable inferences therefrom, are weak evidence of drug-related criminal activity. Each circumstance is consistent with innocent, legal activity, and the circumstances do not sufficiently supplement one another to form reasonable, articulable suspicion.

Therefore, because the record lacks an objective basis from which an officer could reasonably infer that controlled substances may have been present in Boyd's vehicle, the trooper lacked the requisite reasonable, articulable suspicion of drug-related criminal activity to justify the dog sniff during the traffic stop. And because the only evidence supporting Boyd's conviction was discovered through the dog sniff, this issue is dispositive, and Boyd's conviction must be reversed.

**Reversed.**