STATE OF MINNESOTA

IN SUPREME COURT

A22-1436

Court of Appeals

State of Minnesota,

Appellant,

vs.

Jeron Garding,

Respondent.

McKeig, J.

Took no part, Hennesy, Gaïtas, JJ.

Filed: August 28, 2024
Office of Appellate Courts

_____

Keith Ellison, Attorney General, Ed Stockmeyer, Assistant Attorney General, Saint Paul, Minnesota; and

Brian A. Lutes, Wright County Attorney, Buffalo, Minnesota, for appellant.

Cathryn Middlebrook, Chief Appellate Public Defender, Ted Sampsell-Jones, Special Assistant Public Defender, Tacota M. Lemuel, Certified Student Attorney, Saint Paul, Minnesota, for respondent.

_____

S Y L L A B U S

An officer may perform a drug-dog sniff of a vehicle's exterior when he has reasonable, articulable suspicion of drug-related criminal activity due to reasonable inferences that the vehicle's passenger has recently used drugs, a plastic shopping bag in the backseat may contain drugs, and the driver's flight from the scene was causally related to drugs in the vehicle.

Reversed.

1

OPINION

MCKEIG, Justice.

This case requires us to determine whether law enforcement had reasonable, articulable suspicion of drug-related criminal activity to conduct a drug-dog sniff of the exterior of a motor vehicle. Respondent Jeron Garding was arrested after a drug-dog sniff of his parked car led to the discovery of approximately 410 grams of methamphetamine. Garding moved to suppress the drugs found in the car, arguing that law enforcement lacked reasonable, articulable suspicion of drug-related criminal activity to support the drug-dog sniff of the car's exterior. After a contested omnibus hearing at which the State offered testimony from the state trooper who conducted the drug-dog sniff, the district court denied Garding's motion. Garding was convicted of first-degree possession of narcotics after a stipulated facts trial under Minn. R. Crim. P. 26.01, subd. 4, preserving review of the pretrial ruling on his suppression motion. Garding then appealed the denial of his pretrial motion to suppress. The court of appeals reversed, finding that the state trooper did not have reasonable, articulable suspicion of drug-related criminal activity to conduct a drug-dog sniff of the car's exterior. Because we find that, under the totality of the circumstances, the officer possessed sufficient reasonable, articulable suspicion of drug-related criminal activity, we reverse the decision of the court of appeals.

**FACTS**

On August 10, 2021, Jeron Garding was arrested on first-degree narcotics charges, Minn. Stat. § 152.021, subds. 1(4), 2(a)(1) (2022), for approximately 410 grams of methamphetamine found in his car after officers conducted a drug-dog sniff. He filed a

2

motion to suppress the drugs found in the car, arguing, among other things, that the officers did not have reasonable, articulable suspicion to conduct the drug-dog sniff of the exterior of his car. The district court held a contested omnibus hearing on Garding's motion to suppress. State Trooper Jacob Bredsten testified at the hearing, and the parties stipulated to four exhibits: dashcam video from the officer's squad car, two screenshots from that footage, and a photograph taken during the search of the car.[1]

According to Trooper Bredsten's testimony, in August 2021, the Minnesota State Patrol undertook an organized police operation in rural Wright County to target drug, weapon, and sex trafficking into northern Minnesota. At the time, traffickers were known to be using a route that passed through a sparsely populated area near Hasty along Interstate 94. On the evening of Garding's arrest, Trooper Bredsten was assigned to work a nighttime detail as part of this operation. Trooper Bredsten is a certified drug recognition expert, and he was accompanied that evening by his trained drug-detection dog, as well as a social welfare advocate who specialized in assisting victims of sex trafficking.

Around 8:30 p.m., Trooper Bredsten pulled into a truck stop near Hasty that was just off—but not directly visible from—the interstate. The truck stop included a gas station and a restaurant, which were all part of the same building. From his experience, Trooper Bredsten knew that a truck stop in this area and at this time of night presented a heightened

---

[1] We do not consider three additional photographs or three narrative police reports that are part of the complete record but were not part of the pretrial record at the time of the contested omnibus hearing.

risk of trafficking activity. He also knew that police had initiated a chase commencing at this same truck stop the prior evening.

As Trooper Bredsten arrived at the truck stop, a parked sedan attracted his attention. The vehicle was conspicuous to Trooper Bredsten because it was the only occupied vehicle that was parked away from the gas pumps. Trooper Bredsten saw a male in the driver's seat—later identified as Garding—and a female in the front passenger seat. He ran the car's license plate number and learned that it was registered to an owner who lived in Fergus Falls, which is nearly 130 miles away from Hasty. He also learned that the registered owner of the car was significantly older than either of the car's occupants appeared to be. This discrepancy caught his attention because that year he had observed a trend in his traffic stops involving criminal activity in which drivers were using vehicles registered to owners who were not present.

After Trooper Bredsten ran the car's license plate number, he drove away and parked his squad car in a location where he could continue to monitor the car. As soon as Trooper Bredsten drove away, Garding and the passenger got out of the car, and the passenger went into the gas station while Garding spent a considerable length of time apparently cleaning trash from the car's interior. He appeared to collect items from difficult-to-reach areas and place them in a plastic bag. Trooper Bredsten testified that, in his experience, these difficult-to-reach areas are ones in which contraband can be hidden, but he did not observe Garding extracting any such contraband from the car. He also testified that, in his experience, it is not uncommon behavior for criminals to engage in

4

extensive cleaning of their vehicle when they are aware of an officer's presence, in an attempt to delay their departure until after an officer leaves the scene.

At this point, Trooper Bredsten repositioned his squad car so that it was closer to Garding's car, but he did not activate his emergency lights or block the car from moving in any way. He then approached Garding on foot and asked him if everything was okay. Garding closed the car's driver-side door, walked to the back of the car, and placed the bag of trash inside the trunk. Garding then closed the trunk and responded to Trooper Bredsten that everything was fine before walking away into the gas station.

By that time, the passenger had returned to the car, and Trooper Bredsten turned to speak with her through the partially open driver-side window. During the conversation, the passenger—in response to Trooper Bredsten's questions—stated that she did not have identification, that Garding was her boyfriend, that they had travelled from the Twin Cities, and that she had outstanding warrants. Although the passenger was initially hesitant to reveal Garding's name to Trooper Bredsten, she eventually did so.

While speaking with the passenger, Trooper Bredsten also noticed that she had several physical signs of "prolonged drug use," including recently scabbed pick marks around her mouth, bruising on her legs and arms consistent with intravenous drug use, and decaying teeth. When Trooper Bredsten initially asked the passenger about the pick marks on her face, she told him that they were a result of poison ivy exposure. After Trooper Bredsten told her that he did not believe they were consistent with poison ivy based on his familiarity with such rashes as a hunter and a former military service member, the passenger told him that they were a result of a childhood habit of scratching and picking at

5

her skin. Trooper Bredsten then asked the passenger when she last used meth or heroin, to which she initially responded that she did not use drugs but then stated that she had last used drugs about 6 years ago.

During this discussion, Trooper Bredsten was standing and looking down into the car, and he had a view of both the front and rear seat areas. For a portion of the interaction, Trooper Bredsten was also illuminating the car's interior with his flashlight. He noticed several things inside the car that seemed unusual based on his experience as a drug recognition expert, including a white plastic shopping bag on the rear seat that had been tied up and rolled over. He testified that the plastic bag caught his eye because it "looked like there were numerous rocks on the inside." In Trooper Bredsten's experience, "when you see meth, when it's in a large amount, it breaks up like rocks and it'll look like rocks from the outside within the bag." Nonetheless, Trooper Bredsten testified on cross-examination that he was uncertain about the contents of the plastic bag before the search.

At one point while Trooper Bredsten was speaking with the passenger, he noticed that Garding was watching the encounter through the window of the truck stop restaurant before turning around and walking toward the far side of the gas station. When Trooper Bredsten later went inside the gas station to find Garding, the employees reported that Garding had watched Trooper Bredsten speak with the passenger from the store window, then left the gas station and walked toward the woods. Trooper Bredsten testified that the direction Garding had taken was significant because "there's no highway or really any houses or anything beyond [the wood line], so now it looked like he was trying to hide from the situation and run from the vehicle."

6

Based on all his observations, Trooper Bredsten decided to have his drug dog conduct a sniff around the car's exterior. The dog repeatedly alerted to the possible presence of controlled substances. Trooper Bredsten then deployed the dog to sniff the car's interior, during which the dog again alerted. Finally, Trooper Bredsten searched the car by hand and found approximately 410 grams of methamphetamine in the rocky-looking bag on the rear seat. Garding was then located and arrested.

Following the contested omnibus hearing, the parties submitted briefing on Garding's suppression motion in which Garding contended that, among other things, the drug-dog sniff of the car's exterior was conducted without reasonable, articulable suspicion. The district court denied Garding's motion to suppress. It concluded that Trooper Bredsten had reasonable, articulable suspicion sufficient to proceed with the drug-dog sniff of the car's exterior, explaining:

> Cumulatively, Defendant's behaviors had been very suspicious. Defendant initially backed away from Trooper Bredsten, and then turned and walked into the gas station. Trooper Bredsten later noticed that Defendant was watching him interact with the female passenger from the inside of the store. Defendant later left the store and traveled to the woodline. There was nothing of interest in or beyond the woodline. Trooper Bredsten additionally observed signs of drug use based on his interactions with the female passenger. Her dental hygiene, pick marks, and bruises were consonant with drug use based on Trooper Bredsten's training in controlled substances enforcement. After being confronted by him about drug use, her attempts to explain these indicators changed from a bout of poison ivy to a preexisting medical condition. She later admitted to prior drug use, although she denied any recent drug use. Finally, Trooper Bredsten saw a white plastic bag that appeared "rocky" based on the bag's contents pressing against the walls of the taut, thin plastic bag. This bag was sitting in a hat on the rear bench seat in plain view from the exterior. Based on all of this, Trooper Bredsten had a

7

reasonable, articulable suspicion of drug activity sufficient to justify the exterior dog sniff.[2]

After the district court denied Garding's motion to suppress, he agreed to proceed with a court trial on stipulated facts under Minn. R. Crim. P. 26.01, subd. 4, preserving review of the district court's ruling on his motion to suppress. The district court found Garding guilty of first-degree possession of narcotics, and Garding appealed the district court's ruling on his suppression motion.

The court of appeals reversed, concluding that "Trooper Bredsten lacked the required reasonable, articulable suspicion of drug-related criminal activity to justify the drug-dog sniff of the exterior of the vehicle because the record lacks an objective basis from which an officer could reasonably infer that drugs may be present in the place he sought to search." *State v. Garding*, No. A22-1436, 2023 WL 5696235, at *10 (Minn. App. Sept. 5, 2023). In reaching its conclusion, the court of appeals evaluated each individual circumstance that the State asserted created reasonable suspicion in isolation and found each one independently weak. The court then summarily stated that these circumstances were also insufficient in the aggregate to supply Trooper Bredsten with reasonable articulable suspicion of present, drug-related criminal activity. We granted review.

---

[2]  The district court found Trooper Bredsten's testimony at the contested omnibus hearing credible and also addressed Garding's attacks on the officer's credibility based on two supposed variances between his testimony and the dashcam footage. The district court concluded that one alleged discrepancy was based on Garding's inaccurate representation of Trooper Bredsten's testimony, and the other involved dashcam footage that neither conclusively supported nor adversely weighed against the officer's testimony.

**ANALYSIS**

The use of a trained narcotics-detection dog to sniff the exterior of a motor vehicle is not a "search" requiring probable cause under either the Fourth Amendment or the Minnesota Constitution. *State v. Wiegand*, 645 N.W.2d 125, 133 (Minn. 2002). Instead, before conducting such a drug-dog sniff, a police officer must have a reasonable, articulable suspicion of drug-related criminal activity.[3] *Id.* at 137.

"Reasonable suspicion must be 'based on specific, articulable facts' that allow the officer to 'be able to articulate at the omnibus hearing that [they] had a particularized and objective basis' " for suspecting criminal activity. *State v. Diede*, 795 N.W.2d 836, 842–43 (Minn. 2011) (quoting *State v. Cripps*, 533 N.W.2d 388, 391 (Minn. 1995)). "The reasonable-suspicion standard is not high." *State v. Morse*, 878 N.W.2d 499, 502 (Minn. 2016) (citation omitted) (internal quotation marks omitted). "It is enough that a law enforcement officer can articulate specific facts which, taken together with rational inferences from those facts, objectively support the officer's suspicion." *State v. Lugo*, 887 N.W.2d 476, 486 (Minn. 2016). A trained officer may draw "inferences and deductions that might well elude an untrained person." *U.S. v. Cortez*, 449 U.S. 411, 418 (1981); *see also Morse*, 878 N.W.2d at 502 (same).

---

[3] The State concedes that it is required to show reasonable suspicion. Given the State's concession, we have no occasion to address the antecedent question of whether reasonable suspicion is required for the drug-dog sniff of a vehicle where the vehicle was not stopped by officers, and where the driver was not seized, not present for the drug-dog sniff, and not the owner of the vehicle. Accordingly, we assume but do not decide that reasonable suspicion is required under these circumstances.

Reasonable suspicion is analyzed from the point of view of an objective police officer and in light of the totality of the circumstances. *Lugo*, 887 N.W.2d at 486–87. Where appropriate, the totality of the circumstances may be analyzed by looking first to each identified fact supporting reasonable suspicion independently and then considering whether those facts, even if independently weak, are sufficient in the aggregate. *See State v. Burbach*, 706 N.W.2d 484, 490–91 (Minn. 2005).

Whether an officer has reasonable, articulable suspicion to conduct a drug-dog sniff presents a "mixed question of fact and constitutional law." *Lugo*, 887 N.W.2d at 487. When reviewing a district court's pretrial ruling on a suppression motion, we review the district court's factual findings for clear error and the district court's legal determination that an officer had reasonable, articulable suspicion de novo. *State v. Gauster*, 752 N.W.2d 496, 502 (Minn. 2008).

The State argues that the court of appeals "did not conduct the collective, totality-of-the-circumstances assessment of the facts that is the hallmark of a proper reasonable-suspicion inquiry." The State claims that three "critical facts," when viewed together, support reasonable suspicion: 1) the passenger's physical appearance indicative of potential recent drug use; 2) the shopping bag in the car's back seat that looked to contain rock-like items; and 3) Garding's decision to flee into the woods behind the truck stop.

The State's first highlighted fact relates to Trooper Bredsten's testimony about the passenger's appearance when he approached the car and spoke with her through the car's partially open window. Specifically, Trooper Bredsten testified that "[t]here did appear to be marks around . . . her mouth and on her arms, they were kind of singular" and "[l]ooked

10

like they were relatively recent, scabbed, like pick marks." Relying on his training and experience as a drug recognition expert, Trooper Bredsten testified that the presence of pick marks "gathered around the mouth" was consistent with drug use. In addition to the pick marks on the passenger's mouth and arms, Trooper Bredsten testified that he also saw pick marks on her legs. He also testified that she had bruising on her arms and legs that may have been consistent with "prolonged" intravenous drug use. He further noted that the passenger had "poor dental hygiene" and exhibited stained or decaying teeth. Lastly, Trooper Bredsten testified that, based on his training and experience, stained or decaying teeth and pick marks in the form of small round scabs are "signs of prolonged drug use" specific to methamphetamine.

The court of appeals acknowledged Trooper Bredsten's testimony that the passenger's "appearance was consistent with signs of 'prolonged drug use' and that the marks on her face looked like they were 'relatively recent' but 'scabbed' " before deciding that these facts were "not consistent with the degree of observations of recent drug use that [the court of appeals has] typically found to be sufficient to support a reasonable, articulable suspicion of drug-related criminal activity." *Garding*, 2023 WL 5696235, at *7 (comparing *Wiegand*, 645 N.W.2d at 137, and *Burbach*, 706 N.W.2d at 490–91 with *State v. Cox*, 807 N.W.2d 447, 449, 452 (Minn. App. 2011), and *State v. Folkert*, No. A12-0854, 2013 WL 499764, at *1, *5 (Minn. App. Feb. 11, 2013)). The court of appeals concluded that recent drug use could not be reasonably inferred from the passenger's appearance, essentially requiring a showing of current impairment for an officer to infer recent drug use. *See Garding*, 2023 WL 5696235, at *7–8.

11

But our court has never held that evidence of current impairment is necessary to infer that a person has recently used drugs. Under the totality of the circumstances, officers may reasonably infer a person's recent substance use even if they do not appear to be currently impaired. *See State v. Taylor*, 965 N.W.2d 747, 757–58 (Minn. 2021). Trooper Bredsten testified that the scabs on the passenger's pick marks were "relatively recent" and that she showed signs of "prolonged drug use," and under these circumstances, an officer could reasonably infer that the passenger had recently used drugs.

The parties disagree about the appropriate weight to be given to signs of the passenger's apparent past drug use within the totality of the circumstances analysis.[4] Garding argues that the court of appeals did not err in assigning minimal weight to this fact because the connection between the passenger's appearance and current drug *possession* relies on a series of questionable assumptions.[5] However, the State contends that the court of appeals failed to appreciate how evidence of apparent past drug use lent particularized, corroborative weight to its second highlighted fact: Trooper Bredsten's suspicion that the plastic shopping bag contained drugs.

---

[4] We agree with both parties that we have never announced a per se rule that prevents an officer from relying on observed signs of potential past drug use to support a reasonable, articulable suspicion of drug-related criminal activity.

[5] One such assumption animates Garding's theory of the case as a whole. Namely, he suggests that the passenger's physical signs of potential past drug addiction—decaying teeth and pick marks—were just as consistent with poverty and an attendant lack of access to dental and dermatological care as they were with past drug use. This assertion may well be true, but that does not diminish the reasonableness of the alternative inference, based on the officer's training and experience, that these physical manifestations derived from past drug use. This inference is particularly reasonable here, as the passenger had already told Trooper Bredsten that she was a previous user of methamphetamine and heroin.

Whether *current possession* of drugs can reasonably be inferred from a person's apparent recent drug use is a separate question that cannot be answered by looking to evidence of the passenger's appearance alone. Were the passenger's appearance the only sign of drug use observed by Trooper Bredsten at the time, an inference of drug possession would likely be unreasonable. *See People v. Lampitok*, 798 N.E.2d 91, 107 (Ill. 2003) (officers lacked reasonable suspicion of a defendant's drug possession based on one officer's "subjective perception" that her cohabitant was a drug user); *State v. Miller*, 508 P.3d 542, 547 (Or. Ct. App. 2022) (en banc) ("[E]vidence that a defendant is a drug user or has recently used illegal drugs does not say much at all about whether a defendant currently possesses illegal drugs."). However, depending on the totality of the circumstances, other facts may make the inference of current possession a reasonable one. *See United States v. Guidry*, 817 F.3d 997, 1005 (7th Cir. 2016) (reasonable suspicion justified a drug-dog sniff of a car during a traffic stop because the officer smelled a marijuana odor, recalled smelling marijuana during a previous stop of the driver, and knew his detective bureau had evidence of the driver's drug use); *United States v. Rosian*, 822 F. App'x 964, 967 (11th Cir. 2020) (per curiam) (reasonable suspicion justified extension of a traffic stop because of the defendant driver and passenger's brief stop at a suspected drug house, the passenger's appearance consistent with drug use, and the passenger's admission to previous drug abuse).

Here, other facts tend to make Trooper Bredsten's inference of current possession of drugs in the car more reasonable. Trooper Bredsten's observation of signs of the passenger's past methamphetamine use had a marked impact on the reasonableness of

13

inferences an officer could draw about the contents of the opaque bag that contained "rock"-shaped items. The passenger's apparent past methamphetamine use could reasonably augment an officer's suspicion that the "rocky" contents of an opaque bag were methamphetamine because the officer had knowledge and experience that a larger quantity of the drug "breaks up like rocks." Simply put, neither the "rocky" contents of the plastic bag nor the passenger's apparent recent drug use were enough on their own for an officer to reasonably suspect that there were drugs in the car, but considered together, these two observations tend to make that inference a more reasonable one.

Moreover, the passenger's appearance and the rocky bag were not the only pieces of information relied upon by Trooper Bredsten. The State contends that the court of appeals improperly dismissed evidence of Garding's flight to the woods—the third key fact highlighted by the State—and we agree. The court of appeals observed that Garding's behavior was "undoubtedly suspicious" but that the behavior provided no reasonable basis to infer that the car was involved in drug-related criminal activity. *Garding*, 2023 WL 5696235, at *7.

In general, we have expressed reluctance to rely on evasive or nervous behavior as evidence to support a reasonable, articulable suspicion of criminal activity. *See Burbach*, 706 N.W.2d at 490 (agreeing with a district court's conclusion that a driver's "significantly more than normal nervousness during a traffic stop" was "reasonable in the context of intense police questioning"); *Wiegand*, 645 N.W.2d at 137 (concluding that under circumstances where a driver was "evasive, nervous and had glossy eyes," "acting suspiciously [was] not an articulable basis to suspect criminal activity" that would justify

14

the drug-dog sniff of a car).  However, "[h]eadlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlaw*, 528 U.S. 119, 124 (2000).  Where appropriate, evidence of flight may therefore be considered within the totality of the circumstances supporting an officer's reasonable, articulable suspicion of drug-related criminal activity. *See Lugo*, 887 N.W.2d at 487.

Still, if the only fact known to the officer was Garding's flight to the woods, then it would be difficult for the officer to assert anything more than a suspicion of general criminality, which would not be sufficient to provide reasonable, articulable suspicion for a drug-dog sniff.  But that fact did not stand in isolation.  Garding only fled after watching Trooper Bredsten speak with the passenger and view items visible inside the car, which tends to support the inference that Garding's flight was causally related to some concern about the contents of the car or what the passenger may have told Trooper Bredsten. Further, Trooper Bredsten knew that there was nothing of interest accessible to a pedestrian behind the truck stop, which reinforces the reasonable inference that Garding was motivated by an attempt to withdraw from any possible interaction with law enforcement and avoid detection.  Knowing these facts—and considering them alongside signs of the passenger's recent drug use and the plastic bag in the back seat that had an appearance consistent with large amounts of methamphetamine—gave Trooper Bredsten reasonable, articulable suspicion to permit a drug-dog sniff of the exterior of the car.

The information considered by the district court at the contested omnibus hearing included: 1) the passenger's signs of apparent recent drug use; 2) the plastic shopping bag

appearing to contain "rock-like" items and Trooper Bredsten's knowledge and experience that methamphetamine often has a similarly "rocky" shape; and 3) Garding's flight to the woods after viewing Trooper Bredsten's encounter with the passenger. Any of these facts, viewed independently, may be insufficient to provide reasonable, articulable suspicion for a drug-dog sniff. But viewed in aggregate, *see Burbach*, 706 N.W.2d at 490, these facts furnished a sufficient basis for Trooper Bredsten to reasonably suspect that the car contained evidence of drug-related criminal activity.

Under the totality of the circumstances, including all the facts known to Trooper Bredsten at the time the drug-dog sniff was initiated, and the reasonable inferences drawn from and between those facts, Trooper Bredsten had a reasonable, articulable suspicion permitting him to conduct a drug-dog sniff of the car's exterior. The district court therefore did not err in denying Garding's motion to suppress the evidence obtained as a result of the ensuing search. Accordingly, we reverse the decision of the court of appeals.

## CONCLUSION

For the foregoing reasons, we reverse the decision of the court of appeals.

Reversed.


HENNESY and GAÏTAS, JJ., not having been members of this court at the time of submission, took no part in the consideration or decision of this case.